**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Jeffrey D. Saferstein
Elizabeth R. McColm
Michael J. Colarossi
Grace Hotz

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Petra Diamonds US$ Treasury plc,[1] | Case No. 20-\_\_\_\_\_ (\_\_\_) |
| Debtor in a Foreign Proceeding. | |

**VERIFIED PETITION FOR RECOGNITION**
**OF FOREIGN MAIN PROCEEDING AND MOTION FOR**
**ORDER GRANTING RELATED RELIEF PURSUANT TO SECTIONS 1504,**
**1507, 1515, 1517, 1520, 1521, 1525, AND 105(A) OF THE BANKRUPTCY CODE**

Jacques Breytenbach, in his capacity as the duly authorized foreign representative

(the "Foreign Representative") of Petra Diamonds US$ Treasury plc (the "Debtor"), which is the

subject of a proceeding (the "English Proceeding") relating to a scheme of arrangement (the

"Scheme") commenced under Part 26 of the Companies Act 2006 of England and Wales, as

modified, amended or re-enacted from time to time (the "Companies Act"), and pending before

the High Court of Justice of England and Wales (the "English Court"), by and through his

undersigned counsel, respectfully submits this *Verified Petition for Recognition of Foreign Main*

---

[1]   The debtor in the foreign proceeding, along with the last four digits of its registered company number, is Petra Diamonds US$ Treasury plc (8557). The location of the Debtor's corporate headquarters and registered office is Suite 31, Second Floor, 107 Cheapside, London, EC2V 6DN.

*Proceeding and Motion for Order Granting Related Relief Pursuant to Sections 1504, 1507, 1515,*

*1517, 1520, 1521, 1525, and 105(a) of the Bankruptcy Code* (the "Petition and Motion") seeking

entry of an order substantially in the form attached as Exhibit A hereto (the "Proposed Order")

granting, among other relief, recognition of the English Proceeding as a foreign main proceeding

pursuant to chapter 15 of the Bankruptcy Code (as defined below).  In support of this Petition and

Motion, the Foreign Representative refers the Court to the following contemporaneously filed

materials:  (a) the *Declaration of Jacques Breytenbach in Support of (i) Verified Petition for*

*Recognition of Foreign Main Proceeding and Motion for Order Granting Related Relief Pursuant*

*to Sections 1504, 1507, 1515, 1517, 1520, 1521, 1525, and 105(a) of the Bankruptcy Code and (ii)*

*Certain Related Relief* (the "Breytenbach Declaration");[2] and (b) the *Declaration of Giles*

*Boothman in Support of Verified Petition for Recognition of Foreign Main Proceeding and Motion*

*for Order Granting Related Relief Pursuant to Sections 1504, 1507, 1515, 1517, 1520, 1521, 1525,*

*and 105(a) of the Bankruptcy Code* (the "Boothman Declaration," and together with the

Breytenbach Declaration, the "Supporting Documents").  In further support of the relief requested

herein, the Foreign Representative states as follows:

## PRELIMINARY STATEMENT

1.      The Debtor, Petra Diamonds Limited (the "Parent"), and the Parent's other

subsidiaries (collectively, the "Group" or "Petra") are an independent diamond mining group and

supplier of gem quality rough diamonds to the international market.  The Debtor commenced this

chapter 15 case (the "Chapter 15 Case") in support of the Scheme as a part of a wider financial

restructuring (the "Restructuring").

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Breytenbach Declaration.

2.      As described more fully below, the Scheme provides that the Debtors' existing Notes will be cancelled in exchange for each Noteholder receiving its *pro rata* share of (a) USD 145 million in principal amount of New Notes (as defined below); (b) 56% of the Parent's post-Restructuring equity; (c) the opportunity to participate in a USD 30 million new money investment, and if the Noteholders elect to participate in the USD 30 million new money investment, such Noteholder receiving its pro rata share of (d) USD 150 million in principal amount of New Notes; and (e) 35% of the Parent's post-Restructuring equity, each as described in greater detail below.  In addition, as part of the Restructuring, Petra's first lien facilities are to be revised to reflect terms to which Petra has already obtained the agreement of its first lien lenders. All of the elements of the Restructuring are inter-conditional and the Restructuring is unlikely to be completed if any of the elements are not approved and/or implemented.

3.      The Debtor expects that consummation of the Restructuring, of which the Scheme forms an essential part, will achieve the following objectives:  (i) extensively deleveraging the Group to ensure a stable Group capital structure, which will result in a stronger balance sheet position, a more appropriate level of annual debt service obligations, extended debt maturity dates and a covenant package consistent with the Group's financial forecasts; (ii) improving the ongoing liquidity position of the Group; (iii) enabling the Group to direct its cash resources towards servicing the Group's general corporate and working capital requirements and necessary capital expenditures; (iv) obtaining new capital to enable the Group to finance its debt capital and ongoing expenses and to help facilitate operational performance at the mines; (v) allowing the Group to continue to service its customers, supply the global market, and pay its suppliers and support its employees; (vi) mitigating the risk and avoiding the adverse consequences of any form of insolvency filing by any non-Debtor Group entity; and (vii) providing Noteholders (as defined

below) with the opportunity to benefit from future potential upside through their receipt of new ordinary shares in the Parent.

4.      Accordingly, in support of the Restructuring already underway in the United Kingdom, and to ensure the Debtor's continued, uninterrupted business, the Debtor seeks recognition of the English Proceeding as a foreign main proceeding and related ancillary relief in support thereof.

## JURISDICTION AND VENUE

5.      The Court has subject-matter jurisdiction pursuant to sections 157 and 1334 of title 28 of the United States Code, section 1501 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  This matter is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.  The Debtor confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with the Petition and Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper in this district pursuant to section 1410 of title 28 of the United States Code as the Debtor's sole assets in the United States are located in New York.  The Foreign Representative has properly commenced this case pursuant to sections 1504 and 1509 of the Bankruptcy Code by filing a petition for recognition of the English Proceeding under section 1515 of the Bankruptcy Code.

7.      Sections 1504, 1507, 1515, 1517, 1520, 1521, 1525, and 105(a) of the Bankruptcy Code provide the statutory basis for the relief requested herein.

## BACKGROUND

8.    The following summarizes the Debtor's business, capital structure and events leading to the Restructuring and commencement of this Chapter 15 Case.  The Supporting Documents provide detailed information about, among other things, the Debtor, its capital structure, operations and industry challenges.

### A.    Overview of the Debtor's Business

9.    Petra is an independent diamond mining group and supplier of rough diamonds to the international market.  It has a diversified asset portfolio incorporating interests in three producing diamond-mining operations, being underground mines in South Africa (*Cullinan*, *Finsch* and *Koffiefontein*), and one open mine pit in Tanzania (*Williamson*), which has been on care and maintenance since April 2020.  Petra acquired its majority interests in these four mines between 2007 and 2011 from the De Beers Group ("De Beers"), the world's leading diamond company, as part of De Beers' program to divest its older, non-core assets.

10.    Petra's mines produce the full spectrum of diamonds, with large quantities of the mass market goods and smaller quantities of much higher value large and special stones. Under normal conditions prior to the COVID-19 pandemic, Petra conducted daily mining operations at the South African mines five days a week and seven days a week at its Tanzanian mine.  After the initial outbreak of COVID-19 in South Africa, however, the South African government instituted COVID-19 response measures that detrimentally impacted the daily production capabilities of Petra's three South African mines.  In an effort to offset their reduced daily production capabilities, the three South African mines have generally conducted mining operations seven days a week during the COVID-19 pandemic.  Operations at Petra's Tanzanian

mine were also significantly impacted by the pandemic, causing Petra to place its Tanzanian mine on care and maintenance in April 2020.

11.     In the ordinary course, Petra sells all rough diamond production by the method of open tender to registered and approved clients (*i.e.*, through an auction).  Petra's South African production is mainly offered for sale at the Johannesburg Diamond Exchange and Export Centre.  Should the highest bid at a tender be below the reserve price, Petra has the option to withdraw the parcel and retain it for sale at a future date.  In certain circumstances, Petra can export unsold diamonds to its marketing office in Antwerp for sale.  Petra's Tanzanian production is sold in Antwerp, one of the world's key diamond centers.  There, the diamonds are sorted and sold via open tender in a similar fashion to the Johannesburg tender process.

12.     As Petra's output has grown, its tenders have attracted an increasing number of significant buyers; many of the world's foremost manufacturers and dealers are now regular Petra clients and interest continues to increase as production levels continue to grow.  In fiscal year 2020 (ending June 30, 2020), revenue for the Group was USD 295.8 million, with EBITDA, on a consolidated (adjusted) basis, of USD 64.8 million.

13.     As of December 1, 2020, Petra employed approximately 3,690 employees and approximately 1,300 contractors worldwide.  The Debtor's U.S. assets include (i) a USD 50,000 undrawn professional fee retainer (the "Retainer") held by Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), as counsel to the Foreign Representative and the Debtor, in a non-interest bearing account located with Citibank, N.A. in New York (the "Retainer Account") , and (ii) intangible contract rights under the Notes Indenture (as defined below), which is governed by New York law.

B.      **The Debtor's Pre-Restructuring Corporate and Capital Structure**

14.     The Debtor was incorporated under the laws of England and Wales on March 31, 2015.  The Debtor's headquarters and registered office are located at Suite 31, Second Floor, 107 Cheapside, London, EC2V 6DN.  The Debtor's headquarters is its principal place of business, from which it is primarily controlled, and decision-making is primarily made from.  A significant proportion of the Debtors' administrative functions, including accounting, financial reporting, budgeting, and cash management, are conducted in the United Kingdom.

15.     As reflected in the organization chart attached to the Breytenbach Declaration as Exhibit C, the Parent is a holding company that directly owns 100% of the Debtor's equity interests.  The Parent is listed on the London Stock Exchange under the symbol "PDL."  As of December 9, 2020, the Parent's outstanding share capital consists of 865,431,343 ordinary shares, which each carrying one vote.  The Parent is a tax resident in the United Kingdom, and a majority of the members of the Parent's board of directors reside in the United Kingdom.

16.     Pursuant to that an indenture, dated as of April 12, 2017 (as amended, supplemented or otherwise modified from time to time, the "Notes Indenture"), between, among others, the Debtor, as issuer, and Deutsche Trust Company Americas, as trustee (the "Notes Trustee"), the Debtor issued USD 650 million in aggregate principal amount of 7.25% senior secured second lien notes due May 1, 2022 (the "Notes" and the beneficial holders of the Notes, the "Noteholders").  The Notes bear interest at a rate of 7.25%, payable in arrears on May 1 and November 1 of each year prior to their maturity.  The Notes Indenture and the guarantees of the Notes (described below) are governed by New York law and all parties thereto, together with the Noteholders, have submitted to the jurisdiction of the courts of the state of New York.  A copy of the Notes Indenture is attached to the Breytenbach Declaration as Exhibit D.

17.    The Notes are guaranteed by the Parent and certain of its direct and indirect subsidiaries, being Willcroft Company Limited ("Willcroft"), Petra Diamonds UK Treasury Limited, Petra Diamonds Jersey Treasury Limited, Petra Diamonds Netherlands Treasury B.V., Ealing Management Services Proprietary Limited ("EMS"), Petra Diamonds Holdings SA Proprietary Ltd, Petra Diamonds Southern Africa Proprietary Limited, Tarorite Proprietary Limited ("Tarorite"), Finsch Diamond Mine Proprietary Limited ("FDM"), Blue Diamond Mines Proprietary Limited ("BDM"), Cullinan Diamond Mine Proprietary Limited ("CDM"), Premier (Transvaal) Diamond Mining Company Proprietary Limited, and Petra Diamonds Belgium B.V. (collectively, the "Guarantors").  The Notes are listed on the Irish Stock Exchange and traded on the Global Exchange Market.

18.    The Notes are secured on a second priority basis to Petra's first lien debt liabilities (being the Existing WCF, the Existing RCF, the BEE Facilities, the Hedging Liabilities (each as defined below) and other general banking facilities) described below.

(a)    Existing WCF:  EMS is the borrower under the existing fully drawn 500 million South African Rand ("ZAR") (in aggregate) working capital facilities (the "Existing WCF") provided by ABSA Bank Limited (acting through its Absa Corporate and Investment Banking division) ("ABSA") and Firstrand Bank Limited (acting through its Rand Merchant Bank Division) ("Firstrand" and together with ABSA, the "Existing WCF Lenders").  The Existing WCF bears interest at a rate equal to the Existing WCF Lender's prime rate.  The Existing WCF is a committed facility until its maturity on July 31, 2021 or, if earlier, the date on which the Existing RCF (as defined below) has been fully and finally repaid and the commitments of the Existing RCF Lenders (as defined below) have been reduced to zero.  The Existing WCF and other general banking facilities are governed by the laws of South Africa.  As of November 30, 2020, there is currently ZAR 500 million (approximately USD 33.4 million)[3] in principal amount, plus approximately ZAR 2.7 million (approximately USD 180,475.25) in unpaid interest, outstanding under the Existing WCF.

---

[3]    All USD approximations of ZAR amounts set forth in this Declaration were calculated as of December 9, 2020 using the applicable USD-ZAR exchange rate published by the *Wall Street Journal* as of market close.

The Existing WCF and the other general banking facilities provided by the Existing WCF Lenders are guaranteed by the Parent, the Debtor and the Guarantors and secured on a first lien basis, *pari passu* with the Existing RCF Lenders, Existing BEE Facility Lenders (as defined below) and the Hedge Providers (as defined below) by the Transaction Security (as defined in the Explanatory Statement) and Willcroft's shares in Williamson Diamonds Limited[4] (together with the Transaction Security, the "Eirst Lien Transaction Security").

(b)    Existing RCF:  EMS is the borrower under the existing revolving credit facility (the "Existing RCF") provided by ABSA and Nedbank Limited (acting through its Nedbank Corporate and Investment Banking division) ("Nedbank" and, together with ABSA, the "Existing RCF Lenders").  EMS has drawn down on ZAR 400 million (approximately USD 26.7 million) of the Existing RCF, which may be increased up to ZAR 1 billion (approximately USD 66.8 million).  As of November 30, 2020, there is an additional approximately ZAR 1.4 million (approximately USD 93,579,76) outstanding in unpaid interest under the Existing RCF.  The Existing RCF bears interest at a rate equal to the Johannesburg Interbank Average Rate ("JIBAR") plus 9% per annum and matures on July 31, 2021.  EMS may use the Existing RCF for the purposes of funding various prospecting and mining projects of the Group, funding the Group's capital expenditures and for working capital requirements.  The Existing RCF is governed by the laws of South Africa.

The Existing RCF is guaranteed by the Parent, the Debtor and the Guarantors and secured on a first lien basis, *pari passu* with the Existing WCF Lenders, the Existing BEE Facility Lenders and the Hedge Providers, by the First Lien Transaction Security.

(c)    BEE Facilities:  Itumeleng Petra Diamonds Employee Trust[5] and Kago Diamonds (Pty) Limited[6] (together, the "BEE Partners") obtained term loan financing (the "BEE Facilities" and, together with the Existing WCF and the Existing RCF, the "First Lien Facilities") from ABSA, Firstrand and Ninety One SA Proprietary Limited (for and on behalf of its clients) (collectively, the "Existing BEE Facility Lenders" and, together with the

---

[4]    Willcroft is a direct, wholly owned subsidiary of the Parent.  Williamson Diamonds Limited ("WDL") is an indirect subsidiary of the Parent and direct subsidiary of Willcroft, of which Willcroft owns 75% and the government of Tanzania owns 25%.

[5]    Itumeleng Petra Diamonds Employee Trust is a 12% shareholder in each of FDM, BDM and CDM (collectively, the "South African Mine-Owning Entities").  The South African Mine-Owning Entities are indirect and partially owned subsidiaries of the Parent that hold the assets relevant to each of the three mining operations in South Africa.

[6]    Kago Diamonds (Pty) Limited is a 14% shareholder in each of the South African Mine-Owning Entities and a 26% shareholder in Tarorite.  Tarorite is a South African service company and indirect partially owned subsidiary of the Parent.

Existing WCF Lenders and the Existing RCF Lenders, the "First Lien Lenders") to refinance amounts owing by the BEE Partners to the Group, which had provided funding to the BEE Partners to enable them to acquire their interests in the South African Mine-Owning Entities. The aggregate principal amount outstanding under the BEE Facilities as of November 30, 2020 is ZAR 683 million (approximately USD 45.6 million), plus approximately ZAR 2.4 million (approximately USD 160,422.45) in unpaid interest. Each BEE Facility is secured on a first lien basis by the relevant BEE Partner's shares in and claims against the South African Mine-Owning Entities (as defined below), claims against third parties, bank accounts and key contracts.

Each BEE Facility is guaranteed by the Parent and the Security SPV (as defined in the Explanatory Statement) and, as a result, is indirectly secured by the First Lien Transaction Security on a *pari passu* basis with the Existing WCF Lenders, the Existing RCF Lenders and the Hedge Providers. The maturity date of the BEE Facilities is July 31, 2021. The BEE Facilities bear interest at a rate equal to JIBAR plus 9% per annum, and is payable on a semi-annual basis. The BEE Facilities are governed by the laws of South Africa.

(d)   Hedging Arrangements: Because the Group's First Lien Facilities are in ZAR, but its revenues are in U.S. dollars, the Group monitors the movement of the ZAR against the U.S. dollar and hedges a portion of future diamond sales when weakness in the Rand indicates it is appropriate to do so. The hedging facilities are generally short term in nature, provided pursuant to the Hedging Agreements (as defined in the Explanatory Statement) between any of the Parent, Debtor or a Guarantor and ABSA, Firstrand or Nedbank (collectively, the "Hedge Providers"). The mark to market exposure of the Group under or in connection with the Hedging Agreements to a hedging transaction was approximately ZAR 15.6 million (approximately USD 1.04 million) as of November 30, 2020 (the "Hedging Liabilities"). The Hedging Liabilities are secured and rank *pari passu* with the First Lien Facilities.

## C.   **Events Preceding Commencement of the English Proceeding**

19.   Since acquiring the mining rights in its four mines from De Beers between 2007 and 2011, Petra has made significant capital expenditures in the mines. Prior to Petra's ownership, the mines had all undergone a prolonged period of period of underinvestment, with insufficient capital and other resources committed to their long-term continuity. As a result, Petra invested USD 1.6 billion during fiscal years 2006 to 2020 with the goal of remedying the effects of the prolonged underinvestment in order to extend the lives of the assets to the benefit of all

stakeholders. This significant investment period resulted in Petra's annual production growing from approximately 170,000 carats in fiscal year 2006 to approximately 3.9 million carats in fiscal year 2020 and its annual revenue growing from USD 20.9 million to USD 463.6 million over the same period. The capital investment, however, required significant debt financing. In 2017, the Debtor issued the Notes to bolster its balance sheet and provide Petra with greater financial flexibility.

20.     Petra's performance is closely linked to market trends in the diamond market. The last six years, however, have seen a significant decline in rough diamond prices. The Bloomberg rough diamond price index, which has suspended publication of figures since March 2020 due to the COVID-19 pandemic, has rough diamond prices declining annually by 19% as of March 31, 2020, and diamond prices realized by the Group decreased by 18% in fiscal year 2020. This, in turn, has had a significant effect on the Debtor's financial health and prospects.

21.     In response to the decline in rough diamond prices, in July 2019, Petra launched a bottom-up assessment of its business to identify opportunities, drive efficiencies and facilitate improvements across all aspects of the business (such initiative, "Project 22"). The objective of Project 22 was to deliver an initial target of USD 150-200 million free cash flow over a three-year period, with delivery weighted toward fiscal years 2021 and 2022, and reduce net debt in the Group. Project 22 has had a positive impact on productivity, with the Group delivering the highest level of run-of-mine production (*i.e.*, ore that is mined and ready to be transported to the processing plant) recorded in the Parent's history for the first nine months of fiscal year 2020 prior to the impact of mine closures and reduced production capability as a result of COVID-19 response measures. However, the global decline in rough diamond prices and the impact of COVID-19 on

11

the fiscal year 2020 tenders had a significant impact on the Group's revenue, largely offsetting the immediate benefits achieved through Project 22.

22.    In June 2020, the Parent launched a public sale process, by tender, with the intention of finding a buyer for the Group's businesses.  Given the specialized nature of the industry in which the Group operates, the sale process was marketed to a group of approximately 70 potential buyers, based on advice from the Group's advisors.  On or around July 27, 2020, the Group received non-binding bids from prospective buyers.  After careful consideration, Petra and its board of directors determined that a disposal of the business, or a sale of substantially all of the Group's assets for the consideration offered, was not in the best interests of the Group's stakeholders, particularly in light of the expected benefits to the Group's stakeholders if the Group proceeded with the Restructuring (which, as described below, was being negotiated around the same time).  As a result, the Group determined not to pursue any of the bids, at least until after the Restructuring is implemented (or becomes incapable of implementation).

23.    Like other companies throughout the world, the economic uncertainty caused by the COVID-19 pandemic and the restrictions imposed by governments in response to the COVID-19 pandemic have further impacted the Group's revenue.  The total revenue impact as a result of the COVID-19 pandemic is expected to be USD 97.11 million for fiscal year 2020.

**D.    Restructuring Negotiations and the Lock-Up Agreement**

24.    As a result of its operating results and cash flow position, Petra failed to meet cash flow-related financial covenants under the First Lien Facilities in respect of December 2019 covenant tests.  The Parent has, since March 2020, sought and obtained waivers from the First Lien Lenders of such covenant defaults.  In May 2020, Petra failed to pay the interest payment on the Notes, triggering a default under the Notes Indenture.  In response, on May 29, 2020, Petra entered into a forbearance agreement (the "Forbearance Agreement") with an ad hoc committee

(the "<u>Ad Hoc Committee</u>") of Noteholders holding approximately 50.7% of the total Notes Debt[7]

and an amendment to the First Lien Facilities (the "<u>First Lien Amendment Agreement</u>") with the

First Lien Lenders, pursuant to which the Parent drew down on each of the Existing RCF and the

Existing WCF in the amounts of ZAR 400 million (approximately USD 26.7 million) and ZAR

500 million (approximately USD 33.4 million), respectively, to meet short-term liquidity needs.

The First Lien Amendment Agreement also aligned the maturity dates of each of the First Lien

Facilities and rescheduled capital repayments due in May 2022 and November 2022, among other

things.  Each of the Forbearance Agreement with the members of the Ad Hoc Committee and the

First Lien Amendment Agreement with the First Lien Lenders was intended to be an interim

measure to address Petra's immediate liquidity concerns, and the counterparties agreed that a

broader financial restructuring with the Group would follow.

   25. In an effort to achieve a restructuring of its balance sheet, the Group, the Ad

Hoc Committee and the First Lien Lenders continued extensive negotiations to address Petra's

ongoing debt service obligations in respect of the Notes and, as a result, have proposed the

Restructuring, of which the Scheme is an integral part.  The Restructuring, if implemented, will

result in a material reduction of the aggregate principal amount of indebtedness, extended

maturities, and the issuance of equity to the Scheme Creditors[8] who are Noteholders.  The

Restructuring will also provide additional liquidity to the Group, while reducing the overall

principal amount of debt and cash-pay interest obligations of the Group.  Consummation of the

---

[7] As defined the Explanatory Statement, "<u>Notes Debt</u>" includes, in relation to the Notes, all present and future monies debts and Liabilities (as defined in the Explanatory Statement) owed or incurred from time to including the outstanding principal amount of such Notes and any accrued but unpaid interest, by the Parent, the Debtor or any Guarantor.

[8] As defined in the Scheme, "<u>Scheme Creditors</u>" means (a) the Notes Trustee; (b) the The Depository Trust Company, as the registered holder of the Global Notes ("<u>DTC</u>"); (c) Cede & Co., as the nominee for DTC; and (d) the Noteholders.  *See* Breytenbach Decl., Ex. E, app. 1 at 12.

Restructuring will put the Group in a stronger position to continue operations to realize and optimize the value of its mining assets, particularly in the current market conditions, and to deliver growth for the Debtor's stakeholders.

26.    On November 17, 2020, following negotiations with the Ad Hoc Committee and the First Lien Lenders, the Debtor entered into a lock-up agreement (the "Lock-Up Agreement") with (i) all of the First Lien Lenders and (ii) Noteholders representing approximately 61.2% of the aggregate principal amount of the Notes.  As of the Early-Bird Deadline (as defined below), Noteholders subject to the Lock-Up Agreement hold approximately 94.92% of the aggregate principal amount of the Notes.  Pursuant to the Lock-up Agreement, the parties agreed, among other things and subject to certain conditions, to take all steps and other actions reasonably necessary to support, facilitate, implement, consummate or otherwise give effect to the Restructuring, including, in respect of the participating Noteholders, by virtually attending the Scheme Meeting in person or by proxy and voting in favor of the Scheme, and by not taking certain enforcement actions with respect to the Debtor, including in respect of the missed interest payments due November 2020, subject to customary limited carve-outs.  The Lock-Up Agreement further provides that each Noteholder that executed the Lock-Up Agreement on, or within 14 days of, the date of that agreement (the "Early-Bird Deadline") is entitled to a lock-up fee (the "Lock-Up Fee") in consideration for the benefit afforded to Petra from the certainty as to support for the Restructuring and votes in favor of the Scheme at the Scheme Meeting.  The Lock-Up Fee for each applicable Noteholder is equal to 1% of the principal amount of Notes held by the Noteholder that were subject to the Lock-Up Agreement as of the Early-Bird Deadline.  The Lock-Up Fee is payable in New Notes.

**E.     Description of the Scheme and the Restructuring**

27.     The Restructuring and the Scheme are described in detail in the explanatory

statement that accompanied the Debtor's application to the English Court for a hearing to convene

the Scheme Meeting (the "Explanatory Statement"), a copy of which is attached to the Breytenbach

Declaration as Exhibit E, and include the following key terms:[9]

(a)    New Money Investment & Backstop:  A key feature of the Restructuring is
the USD 30 million to be contributed to the Debtor (the "New Money") by
certain Noteholders as a subscription for, or purchase of, USD 30 million of
New Notes (as defined below) (such New Notes, the "New Money Notes"
and such Noteholders, the "New Money Noteholders").  Each Noteholder
will have the right to subscribe for a portion of the New Money pro rata to
the proportion of the total aggregate principal amount of the Notes that the
Noteholder holds as of 5.00 p.m. (New York time) on January 6, 2021 (the
"Record Time"), and the option to oversubscribe for the New Money by
electing to subscribe for its pro rata portion of the amount that is the
difference between USD 30 million and the aggregate amount of the New
Money committed by all Noteholders (the "New Money Shortfall").
Pursuant to a backstop agreement (the "Backstop Agreement"), certain
Noteholders have agreed to backstop the New Money.  In exchange, each
such Noteholder will receive its *pro rata* share (based on its backstop
commitments) of USD 1.5 million in principal amount of the New Notes
(being 5% of the New Notes issued as New Money Notes) (the "Backstop
Fee").

(b)    New Notes:  The Scheme will effect the assignment and cancellation of the
Notes Debt of each Scheme Creditor in exchange for a debt-for-equity
conversion and the partial reinstatement of the Notes by virtue of the issue
to each Noteholder of new senior secured second lien notes (the "New
Notes").  The key features of the New Notes, as they differ from the Notes
(and as will be documented in the amended Notes Indenture (the "Amended
Notes Indenture")), are as follows:

(i)    *Amount*:   The amount of the New Notes is expected to be
approximately USD 337 million on completion of the Restructuring.

---

[9]    The following summary of the Restructuring is provided solely for ease of reference.  Although the Debtor
believes the summary is fair and accurate, it is qualified in its entirety by the Explanatory Statement (including
the Scheme attached thereto), which is incorporated herein by reference.  In the event of any conflict,
inconsistency, or discrepancy between a description of the Restructuring in this Declaration and the Explanatory
Statement, the Explanatory Statement governs and controls for all purposes.

(ii)    *Maturity Date*:  The New Notes will have a maturity date of five years from the effective date of the Restructuring, reflecting an extension of the existing maturity date (May 2022).

(iii)   *Interest*:  The New Notes will bear interest (A) payable in-kind at a rate of 10.50% per annum for the first 24 months of the term of the New Notes and (B) thereafter, payable in cash at a rate of 9.75% per annum, in each case payable semi-annually in arrears.  Pursuant to new intercreditor arrangements between the Noteholders and the First Lien Lenders, the cash-pay interest applicable after the first 24 months is subject to the following conditions:  (X) a debt service ratio covenant (being the ratio of cash flow to the debt service on the New Bank Facilities (as defined below)) equal to at least 1.3x; (Y) the amount outstanding under the New RCF (as defined below) must not be more than ZAR 400 million (as reduced over time through amortization in accordance with the terms of the New RCF) immediately prior to the interest payment and for a period of two (2) weeks thereafter; and (Z) the Parent must be able to evidence that its unrestricted cash balance post payment of the interest payment would be in excess of USD 20 million (clauses (X) through (Z) hereunder, the "Coupon Payment Conditions").  If the Coupon Payment Conditions are not met and the Debtor cannot pay the cash-pay interest payment, it will be in default under the Amended Notes Indenture.

(iv)    *Non-Call Protection*:  The Amended Notes Indenture will contain two-year non-call protection (with a customary make-whole obligation) and a coupon step-down profile thereafter at 104.88%, 102.44%, then par (but excluding any prepayments or redemptions).

(v)     *Covenants*:  The Amended Notes Indenture will contain restrictive covenants and a tightening of existing covenants relative to the current Notes Indenture, including capped baskets of first lien debt and prohibitions on other *pari passu* or junior unsecured debt being incurred (the latter being subject to ordinary course exceptions). The Amended Notes Indenture will also contain a minimum liquidity covenant for the Parent, the Debtor and the Guarantors.

(vi)    *Guarantors*:  The Parent, Petra Diamonds UK Services Limited and the existing Guarantors (other than Petra Diamonds Jersey Treasury Limited and Petra Diamonds Netherlands Treasury B.V., which will be released as Guarantors) will guarantee the New Notes.

(vii)   *Security Package*:  The New Notes will retain substantially the same second ranking security package, including guarantees from a majority of the Group members.  The security package will also be enhanced to include (without limitation) security in favor of the

16

Noteholders over intra-Group offtake receivables and inventory at all relevant points in the Group's supply chain (unless and until such inventory is sold to a third party).  The Group will also be bound by a pre-enforcement cash flow waterfall, which will cover all cash flows in, out and within the Group (excluding WDL).[10]

(viii)   *Events of Default*:  The events of default under the Amended Notes Indenture will be the same as those under the Notes Indenture, as amended to take into account the new covenants related to the New Notes.

(ix)   *Rating and Listing*:  The Parent will procure a public instrument rating on the New Notes within six months of the effective date of the Restructuring and will be required to maintain a rating on the New Notes.  The New Notes will be listed on the Official List of the Irish Stock Exchange.

Each Noteholder's proportion of its Notes Debt that will be reinstated as New Notes will be determined by the following factors:

(A)   whether, and to the extent to which, the Noteholder has elected to exercise its entitlement to contribute to the New Money;

(B)   whether, and to the extent to which, the Noteholder has subscribed for the New Money and therefore has elected to provide (on a *pro rata* basis) any portion of the New Money not otherwise contributed by the initial *pro rata* entitlement contributions of electing Noteholders;

(C)   whether the Noteholder has been required to subscribe for a further portion of New Notes in respect of the New Money, which shall be in addition to their *pro rata* entitlement and any oversubscription, pursuant to the Backstop Agreement (in which the Noteholders have agreed to backstop the New Money to the extent that there is a New Money Shortfall which remains after taking account of all oversubscriptions by Noteholders or if any of the New Money committed by the New Money Noteholders is not funded by the due date for funding the New Money);

(D)   whether the Noteholder is entitled to a New Money Noteholder portion of the US 150 million of the New Notes, such portion to be *pro rata* to the New Money Noteholder's aggregate contribution to the New Money (including its own

---

[10]   WDL will remain a ring-fenced asset outside the security package for the New Notes.

*pro rata* entitlement, any oversubscription and any amount of the New Money Shortfall that the New Money Noteholder is required to provide under the Backstop Agreement) as a proportion of the total New Money.  This entitlement represents a roll-up of the New Money Noteholders at a ratio of 5.0:1 (five New Notes dollars for every one New Money dollar (as an addition to the New Notes issued in consideration for the New Money));

(E)     each Noteholder's (including the New Money Noteholders') entitlement to USD 145 million allocation of the New Notes, such allocation to be *pro rata* to the proportion of the aggregate principal of all Notes that each Noteholder holds at the Record Time; and

(F)     the Noteholders are each eligible for certain fees in connection with the Restructuring, including the Lock-Up Fee and the Backstop Fee.

(c)     <u>Debt-for-Equity Exchange</u>:  For the Scheme Creditors that are Noteholders, the Restructuring will involve the assignment of the portion of each Noteholder's Notes that is not to be reinstated as New Notes to the Parent in exchange for the issue of new ordinary shares of the Parent to the Noteholders.  The new ordinary shares will be issued to each Noteholder as follows:  (i) a total of 56% of the Parent's post-Restructuring equity to be issued to all Noteholders (including the New Money Noteholders), to be allocated pro rata to the proportion of the aggregate principal of all Notes that the Noteholder holds at the Record Time and (ii) a total of 35% of the Parent's post-Restructuring equity, to be issued to New Money Noteholders pro rata to the New Money Noteholder's aggregate contribution to the New Money (including its own entitlement, any oversubscription and any amount of the New Money Shortfall that the New Money Noteholder was required to provide in accordance with the Backstop Agreement) as a proportion of the total New Money. The Parent's listing on the London Stock Exchange will be retained.  The Parent's issuance of the new ordinary shares is subject to approval by its existing shareholders, and such approval is a condition to the effectiveness of the Scheme.[11]

(d)     <u>First Lien Facilities</u>:  In connection with, and conditional on, the Restructuring, the First Lien Lenders, the Parent and the Group have agreed

---

[11]     If the existing shareholders do not vote to approve the issuance of new ordinary shares, the Restructuring will not be implemented.  In such circumstances, it may be possible to consummate an alternative restructuring involving the transfer of certain of the Group's assets and liabilities, including all of the Debtor's subsidiaries, cash balances and other assets, to a specially incorporated vehicle owned by the Noteholders by way of a credit bid (the "<u>Noteholder Credit Bid</u>").  The Noteholder Credit Bid would be expected to involve the Group filing for administration in England pursuant to the Insolvency Act 1986 (UK) and provisional liquidation in Bermuda pursuant to section 161 of the Bermudan Companies Act 1981, in parallel.  The Scheme provides for the relevant

to the following terms related to the First Lien Facilities (the "New Bank Facilities"):[12]

(i)    *New Term Loan*:  The Existing WCF Lenders and the Existing BEE Facility Lenders have agreed to provide the Group with a term loan (the "New Term Loan") in the amount of ZAR 1.2 billion (approximately USD 80.2 million), to be fully drawn on the effective date of the Restructuring, to settle the drawn Existing WCF and the BEE Facilities.  The New Term Loan will have a maturity three years from the effective date of the Restructuring and bear interest a rate of JIBAR plus 5.25% per annum, with an upfront fee of 1% of the amount of the New Term Loan (the latter being capitalized).

(ii)    *New RCF*:  The Existing RCF Lenders have agreed to provide the Group a new revolving credit facility (the "New RCF") in the amount of ZAR 560 million (approximately USD 37.4 million), of which ZAR 400 million (approximately USD 26.7 million) shall be drawn on the effective date of the Restructuring, rolled over from the Existing RCF.  The New RCF will be used for working capital purposes and to settle the drawn Existing RCF.  The New RCF will have a maturity three years from the effective date of the Restructuring and bear interest at a rate of JIBAR plus 5.25% per annum, with an upfront fee of 1% of the amount of the New RCF (the latter being capitalized).  There will be a commitment fee on any undrawn commitments under the New RCF of 2.1% per annum.

(iii)    *Ancillary Facilities*:  The First Lien Lenders have agreed to continue to make available certain ancillary facilities including guarantee lines and soft lines to the Group, which, as of the date of the Explanatory Statement, consist of a ZAR 32 million (approximately USD 2.1 million) guarantee line and a ZAR 1.045 billion (approximately USD 69.8 million) soft line, each consistent with the pre-May 2020 amendment levels and the operational requirements of the Group going forward.

(iv)    *Hedging*:  The First Lien Lenders have agreed to allow for hedging lines of up to ZAR 300 million (approximately USD 20.0 million)

---

provisions of the Notes Indenture to be amended to permit the Group to raise up to USD 45 million in interim 1.5 lien financing to pursue the Noteholder Credit Bid. The Noteholder Credit Bid, if utilized, would likely be implemented through a second scheme of arrangement or a restructuring plan (pursuant to Part 26 or Part 26A of the Companies Act 2006) once terms had been agreed between the relevant parties. The Lock-Up Agreement does not require the parties to the Lock-Up Agreement to support the Noteholder Credit Bid.

[12]    Given that the First Lien Lenders have already agreed to the New Bank Facilities, their further approval of the Scheme is not required and thus they are not Scheme Creditors (which include only the Notes Trustee, the Noteholders, DTC, as the registered holder of the Global Notes, and Cede & Co., as the nominee for DTC).

of aggregate potential future exposures to hedge against the Group's foreign currency exchange risks.  The terms of the Group's existing hedging arrangements will be amended to have maturities staggered over the year following the effective date of the Restructuring.

28.     The Scheme also provides that the Scheme Creditors authorize the waiver and release of the Released Parties[13] from certain claims relating to the Notes, the Scheme and the Restructuring, as applicable.   Specifically, the Scheme provides that the Scheme Creditors authorize the Debtor to enter into the deed of release appended to the Scheme as Schedule 2 (the "Deed of Release") on behalf of the Scheme Creditors.  The Deed of Release will become effective and unconditionally and irrevocably binding upon all Scheme Creditors (and any person who acquires any interest in a Scheme Claim (as defined in the Scheme) after 5:00 p.m. (New York time) on January 6, 2021) on the Restructuring Effective Date (as defined in the Scheme).  *See* Breytenbach Decl., Ex. E, app. 1 at § 6.  The Deed of Release provides that, subject to certain exceptions, the Scheme Creditors release the Released Parties from any claims they may have had, currently have or in the future may have, in connection with or in any way arising out of the Scheme Claims, the Notes Indenture, the Notes (including the Guarantors' guarantee of the Notes), the Scheme and the Restructuring.  *See* Breytenbach Decl., Ex. E, Sch. 2 at § 2.2.  Additionally, under the Deed of Release, the Scheme Creditors covenant not to take certain actions against the Released Parties with respect to claims arising under the Notes, and the preparation, negotiation

---

[13]     As defined in the Deed of Release, "Released Parties" includes the Scheme Creditors (as defined in the Scheme), the Debtor, Parent, Guarantors, and other Company Parties (as defined in the Scheme), the advisers who have advised on the Restructuring and certain administrative parties, including the Notes Trustee, the Security SPV (as defined in the Scheme), Cede & Co, DTC, and the Information Agent, and in each case their respective affiliates, related entities, and each such person's and its affiliates' and related entities' current and former officers, managers, directors, predecessors, successors, and assigns, each of their directors, officers, employees, agents, managed accounts or funds, management companies, investment managers or advisors (and any entity which: (1) is managed or advised by such person's investment manager or advisor; or (2) such person manages or advises in its capacity as investment manager or advisor), advisory board members, financial advisers, partners, accountants, attorneys, investment bankers, consultants, representatives and other professionals. *See* Breytenbach Decl., Ex. E, App. 1, Sch. 2 at 2.

or implementation of the Scheme or the Restructuring. *See id.* at § 4.1. The waivers, releases and discharges are integral to the Restructuring and necessary to ensure that Scheme Creditors cannot undermine the aims of the Restructuring by bringing claims against other entities involved in the preparation, negotiation, sanction or implementation of the Restructuring, which might in turn give rise to indemnification, contribution or subrogation claims against the Debtor.

**F.    Consequences of a Failure to Implement the Restructuring**

29.    If the Scheme is not approved by the requisite majorities of Scheme Creditors, recognition of the Scheme pursuant to chapter 15 of the Bankruptcy Code is not granted, or any of the other requirements or conditions to the Restructuring are not satisfied (or, where possible, waived) to enable the Restructuring to be implemented in accordance with the presently proposed timetable, the Restructuring is not likely to be consummated. The Debtor believes that, in light of the considerable effort and time which it has taken for the Debtor and the Group to agree to the Restructuring with the First Lien Lenders and the members of the Ad Hoc Committee, the prospects of the Debtor and such key stakeholders agreeing to an alternative transaction that would leave the Group with a viable capital structure before it would become necessary to place the Debtor (and possibly other companies in the Group) into an insolvency procedure are unlikely.

30.    As discussed above, the First Lien Lenders and certain of the Noteholders have agreed to forbear on a number of existing potential events of default pursuant to the First Lien Amendment Agreement, the Forbearance Agreement and the Lock-Up Agreement. The Debtor believes that there is a significant risk that the First Lien Lenders and/or the Noteholders would terminate the present forbearance arrangements if it becomes apparent that the Restructuring is not capable of being implemented (because, for example, the requisite majorities of Scheme Creditors do not vote in favor of the Scheme, the English Court determines not to

exercise its discretion to sanction the Scheme, or recognition of the Scheme pursuant to chapter 15 is not granted).  In those circumstances, the Debtor considers it likely that one or more of the First Lien Lenders, the Noteholders or other creditors of the Group would exercise enforcement-related rights or remedies available to such creditors.  The Debtor may then conclude that the best course of action for the Group would be for the Parent, the Debtors and the Guarantors that hold the Group's significant assets to petition the courts (in the relevant jurisdictions) to commence insolvency procedures to, where possible, benefit from statutory moratoriums and to preserve the Group's going concern position.

31.    In such insolvency proceedings, it is likely that an accelerated marketing and sales process of the business of the Group would be undertaken with a view to effecting a going concern sale (or sales) of the Group's key and operating assets within a short period of time. With respect to the South African Mine-Owning Entities, successful completion of any such sale would be subject to the relevant regulatory approvals being sought and obtained.  The Debtor expects such regulatory approval processes to take up to nine months to resolve from such date as the officeholders appointed to oversee the insolvency proceedings are able to reach binding terms with a prospective buyer. The officeholders would remain in control of the relevant entity(ies) (with the associated costs continuing to accrue) for the entirety of this period.

32.    The Group would likely need additional funding during any insolvency proceedings as to continue trading during such time.  If funding were not to be available, either from the First Lien Lenders, a prospective buyer or otherwise, the Group's creditors would likely bring enforcement actions against the Group members that are obligors and/or Guarantors (including the Parent, the Debtor and the South African Mine-Owning Entities).  Liquidation or similar proceedings for the Parent, the South African Mine-Owning Entities, the Group and/or

potentially other Group members would commence as a result of applicable filings under the relevant local laws. Fragmented proceedings in various jurisdictions may be required, for example, as a result of the Group's creditors enforcing their security in multiple jurisdictions, and such proceedings may pose challenges to selling the Group as a going concern.  Furthermore, the South African Mine-Owning Entities would likely lose their mining rights as a result of commencing liquidation proceedings.  A liquidation scenario is likely to be highly value-destructive for the Group and result in significant job losses for the Group's employees and contractors.

**G.     The English Proceeding**

33.     To implement the Scheme and, therefore, the Restructuring, the Debtor commenced the English Proceeding on December 2, 2020, by applying to the English Court for a hearing to convene the Scheme Meeting (the "Convening Hearing").  The application to the English Court was accompanied by (i) the Explanatory Statement and all documents appended thereto (including the Scheme, which is attached as Appendix 1 to the Explanatory Statement) and (ii) witness statements by Jacques Breytenbach and David John Shilson.   Prior to the commencement of the English Proceeding, notice of the same was given to the Scheme Creditors by means of a "practice statement" letter, dated November 17, 2020 (Breytenbach Decl., Ex. F).

34.     On December 9, 2020, the English Court held the Convening Hearing and subsequently issued a convening order (Breytenbach Decl., Ex. B) (the "Convening Order").  The Convening Order (i) confirms that a meeting of the Scheme Creditors for the purpose of voting on the Scheme (the "Scheme Meeting") will be held at 11:00 a.m. (London time) on January 8, 2021, virtually using Zoom[14] (or at such other time or date as the Debtor may decide and notify to the

---

[14]     Lucid Issuer Services Limited, as information agent of the Debtor (the "Information Agent") will send instructions regarding how to virtually attend the Scheme Meeting to Scheme Creditors upon receipt of a completed account holder letter substantially in the form set out in Appendix 3 to the Explanatory Statement.

Scheme Creditors), (ii) declares that the Foreign Representative is authorized to act as foreign representative in respect of the English Proceeding, including in any chapter 15 proceeding in the United States, and (iii) confirms the documents and notices that will be sent to the Scheme Creditors, including notice of the Scheme Meeting (the "Scheme Meeting Notice") to be delivered to Scheme Creditors as soon as reasonably practicable after the Explanatory Statement has been posted to the Information Agent's website. Convening Order at ¶¶ 2-3, 4-5, 26. Following entry of the Convening Order, on December 10, 2020, the Debtor delivered the Scheme Meeting Notice and the Explanatory Statement for the Scheme to the Scheme Creditors.[15]

35.     It is currently anticipated that the hearing to sanction the Scheme (the "Sanction Hearing") will be held on January 12, 2021. If the English Court enters an order approving the Scheme (the "Sanction Order" and together with the Convening Order, the "English Orders"), the Scheme will become effective pursuant to its terms, and thereby binding on all Scheme Creditors of the Debtor wherever located, upon delivery of the Sanction Order to the Registrar of Companies in England and Wales. Importantly, however, this Court's entry of an order recognizing the Scheme in the United States is a condition precedent to the implementation of the Scheme, and therefore, the implementation of the Restructuring.

---

[15]    The Convening Order provides that the Scheme Meeting Notice will be (a) sent by email to The Depository Trust Company, Euroclear Bank S.A./N.V. and Clearstream Banking, *société anonyme* for distribution to the Scheme Creditors; (b) published via the Regulated News Service operated by the Irish Stock Exchange and as otherwise required by the rules of the Irish Stock Exchange; (c) published via the Regulated News Service operated by the London Stock Exchange; and (d) available via the 'News Announcements' section of the Parent's website (https://www.petradiamonds.com/investors/news/). The Scheme Meeting Notice and certain related documents will also be made available to Scheme Creditors via the Information Agent's website through which it will disseminate information about the Scheme, www.lucid-is.com/petradiamonds. *See* Convening Order at ¶ 4.

**RELIEF REQUESTED**

36.     The Foreign Representative respectfully requests entry of the Proposed

Order granting the following relief (the "Relief Requested"):

(A)     recognizing the English Proceeding pursuant to section 1517 of the Bankruptcy Code as a foreign main proceeding, as such term is defined in section 1502(4) of the Bankruptcy Code;

(B)     recognizing Jacques Breytenbach as the duly authorized "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code for all purposes in the Chapter 15 Case and otherwise;

(C)     granting relief automatically and as of right upon recognition of the English Proceeding as a foreign main proceeding pursuant to section 1520(a), including, without limitation, application of section 362 of the Bankruptcy Code, which shall apply with respect to the Debtor and the Debtor's property (including all intangible property) that is now or in the future located within the territorial jurisdiction of the United States;

(D)     granting certain additional relief pursuant to sections 1521, 1507, and 105(a) of the Bankruptcy Code (to the extent it is not granted automatically and as of right upon recognition of the English Proceeding as a foreign main proceeding pursuant to section 1520(a) of the Bankruptcy Code), including (1) granting comity, and giving full force and effect, to the English Proceeding, the Scheme, the Implementation Deed,[16] the Deed of Release, the Convening Order, and the Sanction Order (if applicable), and (2) granting an injunction prohibiting all persons and entities subject to the jurisdiction of the United States from taking any action inconsistent with, or interfering with the enforcement and implementation of, the Scheme, the Implementation Deed, the Convening Order, or the Sanction Order, including, without limitation:

(a)     taking any of the following actions on account of a Scheme Claim:[17]

---

[16]   As defined in the Scheme, "Implementation Deed" means "the agreement to be entered into by, amongst others, the Scheme Company, the Guarantors and Scheme Creditors substantially in the form made available on the Scheme Website, on or about the date of the Explanatory Statement, governing the implementation of the Restructuring." *See* Breytenbach Decl., Ex. E, app. 1 at 6.

[17]   As defined in the Scheme, "Scheme Claim" means "any Claim in respect of any Liability of the Scheme Company owed to any of the Scheme Creditors arising out of the Notes Indenture (as distinct from the Amended Indenture) on or before the Record Time or which may arise after the Record Time as a result of an obligation or Liability of the Scheme Company incurred, or as a result of an event occurring or an act done, on or before the Record Time (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such

(i)      taking or continuing any act to obtain possession of, or exercise control over, including but not limited to, attaching, repossessing, seizing, or disposing of, as applicable, the Debtor, the Released Parties, or any of their property (including intangible property) that is located within the territorial jurisdiction of the United States or any proceeds thereof (collectively, the "Property");

(ii)      commencing, continuing, or enforcing any action or legal proceeding within the territorial jurisdiction of the United States (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever), including by way of counterclaim, (each individually, an "Action") against the Debtor, the Released Parties, or any of their Property; or

(iii)      commencing or continuing any act or Action to create, perfect or enforce any lien, set-off or other claim against the Debtor, the Released Parties, or their Property, including, without limitation, rights under any contracts with the Debtor or the Released Parties; provided, however, that no action described in sections 555, 556, 557, 559, 560, 561, 562 and 1519(d) and (f) of the Bankruptcy Code shall be enjoined by such injunction;

(ii)      commencing any suit, action, or proceeding in the territorial jurisdiction of the United States against the Debtor, the Foreign Representative, the Released Parties, or any of their respective successors, directors, officers, agents, employees, representatives, advisors, or attorneys in respect of any claim or cause of action, in law or in equity, arising out of relating to any action taken or omitted to be taken in connection with this Chapter 15 Case, the Scheme, the Implementation Deed, the Convening Order, or the Sanction Order, or to resolve any dispute arising out of any provision of the Scheme, the Implementation Deed, the Convening Order, or the Sanction Order; or

(iii)      declaring or considering the filing of the English Proceeding or this Chapter 15 Case a default or event of default under any agreement, contract or arrangement.

---

Claims before or after the Record Time) other than an Excluded Scheme Claim."). *See* Breytenbach Decl., Ex. E, app. 1 at 11.

37.    The relief requested in this Petition and Motion is without prejudice to the Foreign Representative's rights to request any additional relief, including recognition and enforcement of the Sanction Order, if not entered prior to the date of the hearing on this Petition and Motion, as well as any other orders of the English Court, if and when entered.

## BASIS FOR RELIEF

38.    The Foreign Representative and the Debtor seek to fully implement the terms of the Scheme, the Convening Order and, ultimately, the Sanction Order issued by the English Court to effectuate the Restructuring.  To that end, the Scheme and the English Orders must be binding and enforceable in the United States, and the Scheme Creditors must be precluded from taking any actions in the United States that may frustrate the Restructuring effectuated by the English Proceeding.

39.    For the reasons set forth below and in the Supporting Documents, the relief sought herein is appropriate under chapter 15 of the Bankruptcy Code.

**A.    The Debtor Is Eligible to File for Relief
Under Section 109(a) of the Bankruptcy Code.**

40.    The Second Circuit Court of Appeals has held that section 109(a) of the Bankruptcy Code applies to chapter 15 cases and requires that a foreign debtor must reside, have a domicile or place of business, or property in the United States to be eligible to file a chapter 15 petition.  *See Drawbridge Special Opportunities Fund LP* v. *Barnet*, (*In re Barnet*), 737 F.3d 238 (2d Cir. 2013).  Section 109(a) of the Bankruptcy Code does not require a specific quantum of property in the United States, nor does it indicate when or for how long such property must have a U.S. situs.  *See, e.g.*, *In re Berau Capital Res. Pte. Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015).  Decisions interpreting section 109(a) as applied to foreign debtors under other chapters unanimously hold that a debtor satisfies the "property in the United States" eligibility requirement

even when the debtor only has a nominal amount of property in the United States. *See GMAM Inv. Funds Tr. I* v. *Globo Comunicacoes e Partipacoes S.A.* (*In re Globo Comunicacoes e Partipacoes S.A.*), 317 B.R. 235, 249 (S.D.N.Y. 2004) (stating that courts have repeatedly found that there is "virtually no formal barrier" to having federal courts adjudicate foreign debtors' bankruptcy proceedings) (citing *In re Aerovias Nacionales de Colombia S.A.* (*In re Avianca*), 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003) (citation omitted)). Effectively, if a debtor has any property in the United States, section 109(a) of the Bankruptcy Code is satisfied.

41.     Here, the Debtor is eligible to file the Chapter 15 Case. The Debtor has property in the United States and in this jurisdiction. Paul, Weiss, as counsel to the Foreign Representative and the Debtor, holds the USD 50,000 Retainer in the Retainer Account. The Debtor's funds remain in the Retainer Account as of the date hereof and are the Debtor's property (subject to Paul, Weiss's rights under its engagement letter). *See In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372-73 (Bankr. S.D.N.Y. 2014) ("[A] line of authority . . . supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (citations omitted).

42.     In addition, the Notes Indenture independently satisfies section 109(a). The Notes Indenture contains a New York choice-of-law provision and a New York forum-selection provision and therefore constitutes property in New York. *See* Breytenbach Decl., Ex. D at §§ 12.7. Contracts create intangible property rights. *In re Berau Capital Res. Pte Ltd*, 540 B.R. 80, 83 (Bankr. S.D.N.Y. 2015) ("Contracts create property rights for the parties to the contract. A debtor's contract rights are intangible property of the debtor.") (citing *U.S. Bank Tr. N.A.* v. *Am. Airlines, Inc.*, (*In re AMR Corp.*), 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013), *aff'd.*, 730 F.3d 88 (2d Cir. 2012)). The situs of such intangible property rights is the location of the governing law.

28

*See In re Berau Capital,* 540 B.R. at 84.  Thus, any "debt subject to a New York governing law

clause and a New York forum selection clause constitutes property in the United States."  *In re*

*Ocean Rig UDW Inc.*, 570 B.R. 687, 699 (Bankr. S.D.N.Y. 2017) (citing *In re U.S. Steel Canada*

*Inc.*, 571 B.R. 600, 609-11 (Bankr. S.D.N.Y. 2017)), *appeal dismissed*, 585 B.R. 31 (S.D.N.Y.

2018); *see also In re Avanti Commc'ns. Grp. Plc*, 582 B.R. 603, 613 (Bankr. S.D.N.Y. 2018)

(noting that bonds with an indenture governed by New York law satisfied the requirements under

Bankruptcy Code § 109(a)); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 552 (Bankr. S.D.N.Y.

2017) (holding that the "Euro Notes which are governed by New York law and contain a New

York forum selection clause" provided a sufficient basis for jurisdiction); *In re Inversora Eléctrica*

*de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt

subject to New York governing law and a New York forum selection clause is independently

sufficient to form the basis for jurisdiction.") (citation omitted); *In re Berau Capital*, 540 B.R. at

84 ("The Court concludes that the presence of the New York choice of law and forum selection

clauses in the [indenture] satisfies the [Bankruptcy Code] § 109(a) 'property in the United States'

eligibility requirement.").  Accordingly, the Debtor is eligible to be a debtor under section 109(a)

of the Bankruptcy Code.

**B.      The Procedural and Substantive Requirements of
         Chapter 15 of the Bankruptcy Code Are Satisfied.**

43.     In addition to satisfying the general eligibility requirements of the

Bankruptcy Code discussed above, the Foreign Representative also satisfies chapter 15's filing

requirements.  Specifically, chapter 15 requires that a petition for recognition of a foreign

proceeding comply with the procedural requirements set forth in section 1515 of the Bankruptcy

Code.  *See* 11 U.S.C. §§ 1504, 1515.  Substantive requirements must also be satisfied before a

court issues a recognition order.  These include:  (a) that the English Proceeding is a "foreign

proceeding" (and here, more specifically, a "foreign main proceeding"); and (b) that Jacques Breytenbach is a proper "foreign representative." 11 U.S.C. § 1517. As described below, the Petition and Motion, along with the Supporting Documents, comply with the Bankruptcy Code's procedural and substantive filing requirements and establish that the Foreign Representative and the Debtor are entitled to the requested relief.

1.      ***The Petition and Motion Comply with Section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).***

44.     The Chapter 15 Case was duly and properly commenced by filing an Official Form 401 for the Debtor, the Petition and Motion, and the Supporting Documents, accompanied by all fees, documents and information required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), including: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtor, (ii) all parties to litigation pending in the United States in which the Debtor is a party at the time of the filing of the Chapter 15 Case, and (iii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all foreign proceedings with respect to the Debtor that are known to the Foreign Representative; and (d) a certified copy of the Convening Order. *See* Breytenbach Decl. ¶¶ 42-44 (statements pertaining to section 1515(c) and Bankruptcy Rule 1007(A)(4)) and Ex. B (the Convening Order).

45.     Under section 1516(b) of the Bankruptcy Code, the Court is entitled to presume the authenticity of all the documents referenced above that were filed in connection with the Chapter 15 Case. Accordingly, the requirements of section 1515 of the Bankruptcy Code and

Bankruptcy Rule 1007(a)(4) have been met and this Chapter 15 Case was properly commenced. *See* 11 U.S.C. §§ 1504, 1509(a), 1515; Bankruptcy Rule 1007(a)(4).

> **2.    *The Substantive Requirements for Recognition Also Are Satisfied.***

46.    Section 1517(a) of the Bankruptcy Code provides in relevant part that an order recognizing a foreign proceeding "shall" be entered if, in addition to the satisfaction of section 1515 of the Bankruptcy Code as described above, "(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; [and] (2) the foreign representative applying for recognition is a person or body . . . ."  11 U.S.C. § 1517(a).

> (a)    <u>*The English Proceeding Is a Foreign Proceeding*</u>.

47.    Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

U.S.C. § 101(23).

48.    As described further in the Boothman Declaration, there should be little doubt that the English Proceeding qualifies as a "foreign proceeding" under section 101(23) of the Bankruptcy Code.  The English Proceeding is pending in a foreign country, England (a constituent member of the political union comprising the United Kingdom), under a law that allows companies to effectuate binding compromises or arrangements, including the restructuring of liabilities, with their members or creditors (or any class of them) (*i.e.*, Part 26 of the Companies Act) and is therefore an "adjustment of debt."  *See* Boothman Decl. ¶¶ 7-17.  In this instance, the "adjustment of debt" relates to the cancellation of the Notes in exchange for (a) USD 295 million in principal

amount of New Notes, (b) 91% of the Parent's post-Restructuring equity, and (c) the opportunity to participate in the USD 30 million New Money investment. The English Proceeding is a judicial proceeding in that it required the Convening Order to convene the Scheme Meeting and will require the Sanction Order for the Scheme to ultimately be sanctioned, each issued by the English Court, a judicial body of the United Kingdom. *See id.* Parties in interest may object to the proposed Scheme at the Convening Hearing and the Sanction Hearing. *See id.* at ¶¶ 8, 14, 21.

49.     Additionally, courts in this district have consistently recognized English proceedings under the Companies Act as "foreign proceedings" for purposes of chapter 15 of the Bankruptcy Code. *See, e.g.*, *In re Noble Group Limited*, No. 18-13133 (SMB) (Bankr. S.D.N.Y. Nov. 15, 2020); *In re NN2 Newco Limited*, No. 19-23277 (RDD) (Bankr. S.D.N.Y. July 30, 2019); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) (Bankr. S.D.N.Y. May 3, 2019); *In re Avanti Commc'ns Grp. Plc*, No. 18-10458 (MG) (Bankr. S.D.N.Y. Apr. 6, 2018); *In re Bibby Offshore Servs. Plc*, No. 17–13588 (MG) (Bankr. S.D.N.Y. Jan. 18, 2018); *In re DTK Fin. (plc)*, No. 16-13521 (SHL) (Bankr. S.D.N.Y. Jan. 18, 2017); *In re YH Ltd.*, Case No. 16-12262 (SCC) (Bankr. S.D.N.Y. Sept. 8, 2016); *In re OIC Run-Off Ltd. & London & Overseas Ins. Co. Ltd.*, Case No. 15-13054 (SCC) (Bankr. S.D.N.Y. Jan. 11, 2016); *In re B. Endeavour Shipping Co. Ltd.*, Case No. 15-10246 (REG) (Bankr. S.D.N.Y. Mar. 10, 2015).

50.     Accordingly, the English Proceeding is a foreign proceeding under chapter 15 of the Bankruptcy Code.

(b)     *The English Proceeding Constitutes a Foreign Main Proceeding.*

51.     Section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized "as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1). The term "center of main

interests" (or "COMI") is not defined in the Bankruptcy Code.  Courts, however, courts generally

equate COMI with the concept of "principal place of business" under U.S. law.  *See, e.g.*, *Morning*

*Mist Holdings Ltd.* v. *Krys* (*In re Fairfield Sentry Ltd.*), 714 F.3d 127, 133, 137 (2d Cir. 2013); *In*

*re Millennium Global Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 72 (Bankr. S.D.N.Y.

2011); *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 48 (Bankr. S.D.N.Y. 2008).  Courts

have identified certain factors that are relevant in determining a debtor's COMI, including: (a) the

location of the debtor's headquarters; (b) the location of those persons or entities that actually

manage the debtor (which, in certain instances, could be the headquarters of a holding company);

(c) the location of the debtor's primary assets; and (d) the location of the majority of the debtor's

creditors or of a majority of the creditors who would be affected by the case.  *See In re SPhinX,*

*Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd sub nom.*, *Krys* v. *Official Comm. of*

*Unsecured Creditors of Refco, Inc.*, 371 B.R. 10 (S.D.N.Y. 2007).  When analyzing the factors for

determining a debtor's COMI, the Second Circuit has held that COMI should be determined based

on the debtor's activities "at or around the time the Chapter 15 petition is filed."  *In re Fairfield*

*Sentry Ltd.*, 714 F.3d 127, 137 (2d Cir. 2013).  In the absence of evidence to the contrary, a debtor's

registered office is presumed to be the debtor's COMI.  *See* 11 U.S.C. § 1516(c).

52.     Here, the Debtor is incorporated in the United Kingdom and its registered

office and headquarters are in London.  *See* Breytenbach Decl. ¶ 12.  The Court may therefore

presume that the United Kingdom constitutes the Debtor's "center of main interests."  11 U.S.C.

§ 1516(c).  Other evidence strongly supports the statutory presumption.  The Debtor's headquarters

is its principal place of business, from which it is primarily controlled, and decision-making is

primarily made from.  *Id.*  Furthermore, a significant proportion of the Debtors' administrative

functions, including accounting, financial reporting, budgeting, and cash management, are

conducted in the United Kingdom. *Id.* Finally, the Debtor's Notes are guaranteed by the Parent, a Bermuda-incorporated company which is a tax resident in the United Kingdom and listed on the London Stock Exchange. *Id.* ¶ 13.

53.     Given the presumption of section 1516(c) of the Bankruptcy Code and the supporting factual information presented in this Petition and Motion, as further detailed in the Supporting Documents, the United Kingdom constitutes the Debtor's "center of main interests" and the English Proceeding constitutes a "foreign main proceeding" under the Bankruptcy Code.

(c)     *Jacques Breytenbach Is a Proper "Foreign Representative."*

54.     Section 101(24) of the Bankruptcy Code defines "foreign representative" as:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

55.     The Debtor's board of directors previously met and appointed by resolution Jacques Breytenbach as the Foreign Representative. *See* Breytenbach Decl., Ex. A; *see also In re OAS S.A.*, 533 B.R. 83, 98 (Bankr. S.D.N.Y. 2015) (holding that individual appointed by board qualified as a "foreign representative"); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, No. 10-14182 (MG), 2010 WL 10063842 at *2 (Bankr. S.D.N.Y. Nov. 8, 2010) (same).

56.     In addition, the Convening Order expressly authorizes and designates Jacques Breytenbach as the Foreign Representative. *See* Breytenbach Decl. Ex. B ¶ 26. Accordingly, Jacques Breytenbach is a "foreign representative" as defined in the Bankruptcy Code. *See* 11 U.S.C. § 1516(a) ("If the decision [commencing the foreign proceeding] . . . indicates . . . that the person or body is a foreign representative, the court is entitled to so

presume."); *cf. In re SPhinX, Ltd.*, 351 B.R. 103, 116-17 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) (holding that section 101(24) of the Bankruptcy Code was satisfied where foreign representatives submitted a "copy of the Cayman Court's order appointing them to administer the [d]ebtors' winding up under [Cayman law] and authorizing their commencement of these chapter 15 cases").

57.     Finally, Mr. Breytenbach is an individual and thus a "person" as defined in section 101(41) of the Bankruptcy Code.  Mr. Breytenbach thus satisfies each of the requirements of section 101(24) of the Bankruptcy Code and is the Foreign Debtors' "foreign representative" as defined therein.

## C.     The Court Should Grant Discretionary Relief.

58.     To the extent any relief requested in the Proposed Order goes beyond the automatic relief granted pursuant to section 1520—including enforcement of the releases and injunctions in the Scheme—there are several statutory bases for such relief.

### 1.     The Court Should Grant Discretionary Relief Pursuant to Section 1521(a).

59.     Upon recognition of a foreign proceeding, section 1521(a) of the Bankruptcy Code authorizes the Court to grant "any appropriate relief" to a foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors."   11 U.S.C. § 1521(a).   The scope of the discretionary relief available under section 1521(a) is "exceedingly broad," *In re Avanti Commc'ns Grp. Plc*, 582 B.R. 603, 612 (Bankr. S.D.N.Y. 2018), and may include, but is not limited to:

> (1)     staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
>
> (2)     staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3)    suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

. . . and

(7)    granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a).

(a)    *The Relief Requested Sufficiently Protects the Interests of Creditors.*

60.    Section 1522 of the Bankruptcy Code provides that relief under section 1521(a) is appropriate where the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). Although the Bankruptcy Code does not define "sufficient protection," the legislative history indicates that additional relief is only available where U.S. creditors' interests are protected. H.R. Rep. No. 109-31, pt. 1, at 116 (2005) (stating that relief should not be granted where "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors"); *see also In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 82 (Bankr. S.D.N.Y. 2011) (holding that, pursuant to section 1522, the court is "required to ascertain that the interests of U.S. creditors are "sufficiently protected" and is "empowered to effectuate other procedures for the protection of U.S. creditors").

61.    Courts considering this issue generally focus on the procedural fairness of the foreign proceeding, and whether U.S. creditors are entitled to equal treatment in the foreign proceeding. *See, e.g.*, *In re Daebo Int'l Shipping Co., Ltd.*, 543 B.R. 47, 54 (Bankr. S.D.N.Y. 2015) (holding that U.S. creditors' interests were sufficiently protected where they were entitled to file claims in a Korean proceeding, and to equal treatment with unsecured creditors). Courts

may also balance the relief requested by a foreign representative against the creditors' and parties' respective interests. *In re AJW Offshore, Ltd.*, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013).

62.     Here, relief under section 1521 is appropriate because creditors and other parties are sufficiently protected under both analyses.  U.S. and non-U.S. creditors have equal and fair access to the English Proceeding.  All creditors have the opportunity to review the Explanatory Statement (including the Scheme) and may object to the proposed Scheme or otherwise make an appearance via Zoom at the Convening Hearing or the Sanction Hearing.  *See* Boothman Decl. at ¶¶ 8, 14, 21; *see also In re Avanti Communications Group Plc*, 582 B.R. 603, 618 (Bankr. S.D.N.Y. 2018) (recognizing and enforcing U.K. scheme of arrangement, and finding that "[t]he proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards").  Similarly, all Scheme Creditors—wherever located— have the opportunity to vote on the Scheme.  Boothman Decl. at ¶¶ 8, 11-13.  Indeed, the Relief Requested is intended to ensure that all Scheme Creditors affected by the Scheme are treated consistently, regardless of whether they are located in the United Kingdom or the United States. *Id.* at 37.  Accordingly, the interests of all interested parties are sufficiently protected, and the Relief Requested should be granted.

63.     The Relief Requested also satisfies the balancing test employed by some courts.  Entry of the Proposed Order is a condition to the implementation of the Scheme and thus the Restructuring.  *See* Breytenbach Decl. ¶ 28 and Ex. B at 11-12 (Scheme conditions).  If this Court declines to grant the Relief Requested, then the English Proceeding will face legal uncertainty and the Scheme, and therefore the Restructuring, would likely not be consummated. As discussed above, there is a significant risk that the First Lien Lenders and/or the Noteholders would terminate the present forbearance arrangements if it becomes apparent that the

Restructuring is not capable of being implemented.  In those circumstances, it is likely that one or more of the First Lien Lenders, the Noteholders or other creditors of the Group would exercise enforcement-related rights or remedies available to such creditors, setting into action a value-destructive chain of events that would irreparably harm the Debtor and its constituents.  *Id.* ¶¶ 28-31.  Accordingly, the benefits to the Debtor and its creditors resulting from the Relief Requested outweigh any alleged interests of parties that might otherwise seek to undermine the creditor-approved Scheme or English Orders in the United States.

(b)    *The Relief Requested Meets the Standard for Injunctive Relief.*

64.    Under section 1521(e), the standards for injunctive relief apply to certain relief available under section 1521(a)(1), (2), (3), and (6).  Permanent injunctive relief—such as the injunctions requested herein—is appropriate where the movant can show a likelihood of irreparable harm.  This Court has found that a debtor or its estate would suffer irreparable harm where the orderly determination of claims and the fair distribution of assets are disrupted.  *See, e.g.*, *Victrix S.S. Co., S.A.* v. *Salen Dry Cargo A.B.*, 825 F.2d 709, 713-14 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); *In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a single, centralized forum[.]"); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors.").

65.     The United States Supreme Court, the United States Court of Appeals for the Second Circuit, and this Court have all recognized a federal court's authority to grant permanent injunctive relief to enforce foreign plans and discharges.  *See, e.g.*, *Canada S.R. Co.* v. *Gebhard*, 109 U.S. 527, 539 (1883) (concluding that actions brought in the United States by plaintiff bondholders who did not participate in the Canadian insolvency proceedings of the bond issuer could not be maintained, even though the bonds were payable in New York); *Argo Fund Ltd.* v. *Bd. of Dirs. of Telecom Arg., S.A.* (*In re Bd. of Dirs. of Telecom Arg., S.A.*), 528 F.3d 162, 175-75 (2d Cir. 2008) (affirming bankruptcy court decision granting full force and effect to Argentine plan); *In re Avanti Communications Group Plc*, 582 B.R. 603, 615-19 (Bankr. S.D.N.Y. 2018) (granting permanent injunctive relief to enforce scheme of arrangement under the Companies Act, including third-party releases); *In re Sino-Forest Corp.*, 501 B.R. 655, 666 (Bankr. S.D.N.Y. 2013) (granting permanent injunctive relief to enforce Canadian restructuring plan, including third-party releases); *In re Metcalfe & Mansfield*, 421 B.R. 685, 700 (Bankr. S.D.N.Y. 2010) (same).[18]

66.     As discussed above, the Relief Requested is a prerequisite to the implementation of the creditor-approved Restructuring.  Failing to consummate the Restructuring would likely result in a value-destructive chain of events, irreparably harming the Debtor and its creditors.  The Relief Requested is necessary to protect the Debtor and its creditors as a whole and

---

[18]    This Court has also granted injunctive relief in other chapter 15 cases without reported decisions.  *See, e.g.*, *In re NN2 Newco Limited*, No. 19-23277 (RDD) (Bankr. S.D.N.Y. July 30, 2019) (granting injunction to enforce scheme of arrangement under the Companies Act); *In re New Look Secured Issuer plc*, No. 19-11005 (SMB) (Bankr. S.D.N.Y. May 3, 2019) (same); *In re EnQuest PLC*, No. 16-12983 (MEW) (Bankr. S.D.N.Y. Nov. 11, 2016) (same); *In re Quintas Ltd.*, No. 18-12739 (MH) (Bankr. S.D.N.Y. Oct. 11, 2018) (granting injunction to enforce scheme of arrangement under Australian law); *In re Boart Longyear Ltd.*, No. 17-11156 (Bankr. S.D.N.Y. Aug. 30, 2017) (same); *In re Pac. Expl. & Prod. Corp.*, No. 16- 11189 (JLG) (Bankr. S.D.N.Y. Oct. 3, 2016) (granting injunction enforcing scheme of arrangement under Canadian law); *In re Winsway Enters. Holdings Ltd.*, No. 16-10833 (MG) (Bankr. S.D.N.Y. June 16, 2016) (granting injunction enforcing scheme of arrangement under Hong Kong law).

thus satisfies the standard for injunctive relief. The Court should accordingly grant the Relief Requested.

### 2. Alternatively, the Court Should Grant Additional Assistance Pursuant to Section 1507.

67.     To the extent the Court determines not to grant the Relief Requested pursuant to section 1521(a), the Court may still act under section 1507 to provide "additional assistance" to the Foreign Representative, provided that such assistance is "consistent with the principles of comity." 11 U.S.C. § 1507; *see also In re Atlas Shipping A/S*, 404 B.R. 726, 737-38 (Bankr. S.D.N.Y. 2009).[19] The legislative history states that section 1507 provides authority for "additional relief" beyond that permitted under section 1521. H.R. Rep. No. 109-31, pt. 1, at 109 (2005). Courts in this district have concluded they are not required to analyze a request for an enforcement order under section 1507 when the relief requested is explicitly provided for, and granted, under Bankruptcy Code section 1521. *See In re Rede Energia S.A.*, 515 B.R. 69, 95 n. 46 (Bankr. S.D.N.Y. 2014) (citing Atlas Shipping A/S, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009)). Regardless, the Relief Requested is also available as "additional assistance" to the extent that section 1507 applies.

68.     In deciding whether to grant additional relief under chapter 15, courts are guided by principles of comity and cooperation with foreign courts. *See, e.g.*, *Atlas Shipping*, 404

---

[19] Section 1507(b) provides that in determining whether to provide additional assistance:

> [T]he court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—(1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

B.R. at 738; *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389

B.R 325, 333 (S.D.N.Y. 2008). The Supreme Court has held that a foreign judgment should not

be challenged in the United States if the foreign forum provides:

> [A] full and fair trial abroad before a court of competent jurisdiction,
> conducting the trial upon regular proceedings, after due citation or
> voluntary appearance of the defendant, and under a system of jurisprudence
> likely to secure an impartial administration of justice between the citizens
> of its own country and those of other countries, and there is nothing to show
> either prejudice in the court, or in the system of laws under which it is sitting
> . . . .

*Hilton* v. *Guyot*, 159 U.S. 113, 202-03 (1895); *see also Victrix S.S. Co., S.A.* v. *Salen Dry Cargo

A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) ("Federal courts generally extend comity whenever the

foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States

citizens or violate domestic public policy."); *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R.

25, 60, 66-68 (Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002) (noting that comity

should be accorded to foreign court orders as long as "it is shown that the foreign court is a court

of competent jurisdiction, and that the laws and public policy of the forum state and the rights of

its residents will not be violated").

69.      The need to extend comity to foreign proceedings is particularly salient in

the bankruptcy context because "[t]he equitable and orderly distribution of a debtor's property

requires assembling all claims against the limited assets in a single proceeding" to bind all creditors

and comprehensively effectuate a plan of reorganization. *Atlas Shipping*, 404 B.R. at 737 (quoting

*Victrix*, 825 F.2d at 713-14). Accordingly, this Court has routinely enforced third-party releases

in foreign proceedings under section 1507 of the Bankruptcy Code. *See, e.g.*, *In re Avanti

Communications Group Plc*, 582 B.R. 603, 615-19 (Bankr. S.D.N.Y. 2018) (enforcing scheme of

arrangement under the Companies Act, including third-party releases and related injunctions); *In

re NN2 Newco Limited*, No. 19-23277 (RDD) (Bankr. S.D.N.Y. July 30, 2019) (same); *In re New

41

*Look Secured Issuer plc*, No. 19-11005 (SMB) (Bankr. S.D.N.Y. May 3, 2019) (same); *In re Sino-Forest Corp.*, 501 B.R. 655, 666 (Bankr. S.D.N.Y. 2013) (enforcing Canadian restructuring plan, including third-party releases and related injunctions); *In re Metcalfe & Mansfield*, 421 B.R. 685, 700 (Bankr. S.D.N.Y. 2010) (same).

70.    In *Avanti*, this Court enforced the debtor's scheme of arrangement under the Companies Act, including certain third-party releases and related injunctions. The Court held that it could, and would, enforce the releases and injunctions, noting that enforcement was consistent with the principles of comity. *Avanti*, 582 B.R. at 619. The Court also stated that the "failure of a United States bankruptcy court to enforce the [third-party releases] could result in prejudicial treatment of creditors to the detriment of the [*Avanti* debtor's] reorganization efforts and prevent the fair and efficient administration [of the overall restructuring]." *Id.*

71.    Similarly, in *Metcalfe*, this Court enforced Canadian court orders sanctioning the debtors' Canadian restructuring plan, including certain third-party releases and related injunctions. The Court recognized that the proper inquiry was not whether the third-party releases and injunctions could be ordered in a plenary chapter 11 proceeding, but rather, whether recognition of the foreign court orders was a proper exercise of comity in a chapter 15 case. 421 B.R. at 696. The Court held that it was appropriate to grant comity because, among other reasons: "[t]he U.S. and Canada share the same common law traditions and fundamental principles of law. Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process." *Id.* at 698

72.    The facts and circumstances of this Chapter 15 Case are very similar to those in *Avanti* and *Metcalfe*. The United States and the United Kingdom share the same common law traditions and fundamental principles of law, and the Scheme Creditors have a full and fair

opportunity to vote on and be heard in connection with the Scheme, in a manner consistent with U.S. standards of due process. *See, e.g.*, Boothman Declaration, ¶¶ 8, 14, 21; *see also Avanti*, 582 B.R. at 618 (Bankr. S.D.N.Y. 2018) (finding that "[t]he proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards"). Moreover, if this Court declines to enforce the Scheme's release of claims against the Debtor, the Guarantors, and the other Released Parties, then certain Scheme Creditors or other entities could seek to obtain judgments against the Debtor, the Guarantors, or other Released Parties to obtain greater recoveries than those to which they are entitled under the Scheme. *See* Breytenbach Decl. ¶¶ 28-31 (describing the likely consequences if the Restructuring is not implemented). Thus, principles of comity support enforcement of the Scheme and the releases of claims against the Debtor, the Guarantors, and the other Released Parties contained therein. The Relief Requested should accordingly be granted.

### 3.     *The Relief Requested Should Also Be Granted Pursuant to Sections 105(a) and 1525(a).*

73.     Section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Foreign Representative respectfully submits that the Relief Requested is necessary to complete the value-maximizing, creditor-approved Restructuring. The Relief Requested is also consistent with the requirements and purposes of the Bankruptcy Code. In particular, section 1525(a) of the Bankruptcy Code provides that bankruptcy courts "shall cooperate to the maximum extent possible with a foreign court or a foreign representative." *See* 11 U.S.C. § 1525(a). Granting the Relief Requested will support the principles of coordination and cooperation mandated by section 1525(a), and will protect the fair, efficient, and centralized administration of claims in the English Proceeding.

**D.      The Relief Requested Comports with
        Bankruptcy Code and U.S. Public Policy.**

74.      Section 1506 of the Bankruptcy Code provides that a court may deny a request for chapter 15 relief that would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Courts have noted that such "public policy exception" is narrow, that its application is restricted to the most fundamental policies of the United States, and that a foreign judgment should generally be accorded comity if the foreign jurisdiction's proceedings meet fundamental standards of fairness.  *Collins* v. *Oilsands Quest Inc.*, 484 B.R. 593, 597 (Bankr. S.D.N.Y. 2012); *In re Atlas Shipping A/S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009) ("American courts have long recognized the need to extend comity to foreign bankruptcy proceedings because the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding . . . ." (internal quotation marks omitted)); *see also In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (holding that a U.S. bankruptcy court is not required to make an independent determination about the propriety of the acts of a foreign court, but only whether their procedures meet U.S. standards of fundamental fairness).  Furthermore, the relief granted in a foreign proceeding and the relief available in a United States bankruptcy proceeding need not be identical.  Courts have gone so far as to hold that even the absence of a jury trial right—a right embodied in the United States Constitution—in a foreign proceeding would not justify the court's refusal to recognize the foreign proceeding pursuant to the public policy exception.  *See In re RSM Richter Inc.* v. *Aguilar (In re Ephedra Prods. Liab. Litig.)*, 349 B.R. 333, 335–36 (Bankr. S.D.N.Y. 2006).

75.      Here, recognizing and granting comity to the English Proceeding, the English Orders, and the Scheme (including the Deed of Release and other Scheme-implementing documents) will assist the orderly administration of the Debtor's estates by the English Court,

consistent with the public policy of the United States that the Bankruptcy Code embodies. *See Sino-Forest*, 501 B.R. at 665 (enforcing foreign order containing third-party releases, noting that, in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy"). If this Court does not recognize the Scheme, including the Deed of Release, then the English Proceeding will face legal uncertainty and the Scheme, and therefore the Restructuring, is not likely to be consummated.

76.    Additionally, failure to enjoin the Scheme Creditors or enforce the releases in the United States may result in unnecessary enforcement costs or the piecemeal disposition of assets to the detriment of the Debtor and its various stakeholders. The purpose of chapter 15 is to prevent such harms. *See* 11 U.S.C. § 1501(a) (noting that, among other objectives as fully described below, chapter 15 facilitates "the rescue of financially troubled business" and provides for the "fair and efficient administration of cross-border insolvencies"). Avoiding such potential outcomes through the formal recognition of the English Proceeding and enforcement of the Scheme and the English Orders in the United States is consistent with U.S. public policy as embodied in the Bankruptcy Code.

77.    In sum, the Relief Requested effectuates the principal objectives Congress articulated when it enacted chapter 15 of the Bankruptcy Code, and otherwise comports with U.S. public policy.

## **NOTICE**

78.    Notice of this Motion will be provided to: (i) the Debtor; (ii) the Office of the United States Trustee for the Southern District of New York, Attention: Susan A. Arbeit; and (iii) all parties entitled to notice in accordance with the *Application Pursuant to Federal Rules of*

*Bankruptcy Procedure 2002(m), 2002(q) and 9007 for an Order Scheduling a Hearing on Recognition of a Foreign Main Proceeding and Specifying Form and Manner of Service of Notice.*

## NO PRIOR REQUEST

79.    No previous request for the relief sought herein has been made by the Foreign Representative to this Court or any other court.

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests the entry of the Proposed Order granting the relief requested herein and such other and further relief as is just and proper.

Dated:    New York, New York
December 15, 2020

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

/s/ *Jeffrey D. Saferstein*
Jeffrey D. Saferstein
Elizabeth R. McColm
Michael J. Colarossi
Grace Hotz
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
jsaferstein@paulweiss.com
emccolm@paulweiss.com
mcolarossi@paulweiss.com
ghotz@paulweiss.com

*Counsel to the Foreign Representative*

## <u>VERIFICATION OF CHAPTER 15 PETITION</u>

JACQUES BREYTENBACH, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the laws of the United States as follows:

I am the authorized foreign representative of the Debtor with respect to the English Proceeding.  In that capacity, I have full authority to verify the *Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Related Relief Pursuant to Sections 1504, 1507, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "<u>Petition and Motion</u>") on behalf of the Debtor.

I have read the Petition and Motion and the other Supporting Documents (as defined therein), and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:    December 15, 2020              */s/       Jacques Breytenbach*
                                         JACQUES BREYTENBACH