**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Jeffrey D. Saferstein
Elizabeth R. McColm
Michael J. Colarossi
Grace Hotz

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Petra Diamonds US$ Treasury plc,[1] | Case No. 20-_____ (___) |
| Debtor in a Foreign Proceeding. | |

## DECLARATION OF JACQUES BREYTENBACH IN SUPPORT OF (I) VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND MOTION FOR ORDER GRANTING RELATED RELIEF PURSUANT TO SECTIONS 1504, 1507, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE AND (II) CERTAIN RELATED RELIEF

I, JACQUES BREYTENBACH, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States as follows:

1.    I am the Chief Financial Officer of Petra Diamonds Limited, the parent company (the "Parent") of Petra Diamonds US$ Treasury plc (the "Debtor"), which Debtor commenced a proceeding (the "English Proceeding") under Part 26 of the Companies Act 2006 of England and Wales, as modified, amended or re-enacted from time to time, pending before the High Court of Justice of England and Wales (the "English Court"). As Chief Financial Officer, I

---

[1]    The debtor in the foreign proceeding, along with the last four digits of its registered company number, is Petra Diamonds US$ Treasury plc (8557). The location of the Debtor's corporate headquarters and registered office is Suite 31, Second Floor, 107 Cheapside, London, EC2V 6DN.

am responsible for, among other things, overseeing the operations and financial activities of the Parent, including, but not limited to, monitoring cash flow, business relationships and financial planning.  In addition, I also serve on the Parent's board of directors as the Finance Director, where I am responsible for financing, treasury, financial controls, reporting, legal, investor relations, compliance and corporate governance.

2.        I joined the Parent in 2006.  Prior to my role as Chief Financial Officer, I served as the Finance Manager – Operations and was responsible for financial management across the operations of the Debtor, the Parent and the Parent's non-Debtor subsidiaries (collectively, the "Group" or "Petra").  Prior to joining the Debtor, I was employed by Anglo Platinum, where I held various roles, including Finance Manager – Capital Projects, where I oversaw Anglo Platinum's extensive capital expansion programs.  I hold a Baccalaureus Computationis ("B.Compt") and Honours B.Compt.  I am a Chartered Accountant and a member of the South African Institute of Chartered Accountants.

3.        I have been actively involved in the proposed restructuring of the Debtor (the "Restructuring") that will be effectuated pursuant to, among other things, a scheme of arrangement (the "Scheme") if such Scheme is duly approved and sanctioned by the English Court in the English Proceeding, all in accordance with applicable English law.  Accordingly, I have knowledge of the matters described herein.

4.        On November 30, 2020, I was duly appointed as the foreign representative (the "Foreign Representative") of the Debtor by the board of directors of the Debtor.  A copy of the minutes of the meeting at which I was appointed as the Foreign Representative is attached hereto as Exhibit A.  On December 9, 2020, the English Court entered an order (the "Convening Order"), a copy of which is attached hereto as Exhibit B, authorizing the Debtor to, among other

things: (i) convene a meeting of the Scheme Creditors[2] for the purpose of voting on the Scheme

(the "Scheme Meeting") to be held at 11:00 a.m. (London time) on January 8, 2021, virtually using

Zoom[3] (or at such other time or date as the Debtor may decide and notify to the Scheme Creditors);

and (ii) distribute the Explanatory Statement (as defined below), together with an account holder

letter for use by the Scheme Creditors in connection with the Scheme Meeting, to all Scheme

Creditors.  The Convening Order also declared that I am authorized and empowered to act as the

foreign representative of the Debtor in respect of any chapter 15 case that may be commenced in

the United States in connection with the Scheme.

5.    I submit this declaration (the "Declaration") in support of the following

motions and other documents (collectively, the "First Day Pleadings"):  (i) the *Verified Petition*

*for Recognition of Foreign Main Proceeding and Motion for Order Granting Related Relief*

*Pursuant to Sections 1504, 1507, 1515, 1517, 1520, 1521, 1525, and 105(a) of the Bankruptcy*

*Code* (the "Petition and Motion"); and (ii) the *Application Pursuant to Federal Rules of*

*Bankruptcy Procedure 2002(m), 2002(q) and 9007 for an Order Scheduling a Hearing on*

*Recognition of Foreign Main Proceeding and Specifying Form and Manner of Service of Notice*.

6.    I am authorized by the Debtor to submit this Declaration on its behalf in

support of the First Day Pleadings.  I am an individual over the age of 18 and, if called upon, could

testify to all matters set forth in this Declaration.  Except as otherwise indicated, all facts set forth

in this Declaration are based upon my personal knowledge, information supplied to me by other

---

[2]    As defined in the Scheme, "Scheme Creditors" means (a) the Notes Trustee; (b) The Depository Trust Company, as the registered holder of the Global Notes ("DTC"); (c) Cede & Co., as the nominee for DTC; and (d) the Noteholders.

[3]    Lucid Issuer Services Limited, as information agent of the Debtor (the "Information Agent") will send instructions regarding how to virtually attend the Scheme Meeting to Scheme Creditors upon receipt of a completed account holder letter substantially in the form set out in Appendix 3 to the Explanatory Statement.

members of the Debtor's management and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtor's industry, operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND

### A.    Overview of the Debtor's Business

7.    Petra is an independent diamond mining group and supplier of rough diamonds to the international market.  It has a diversified asset portfolio incorporating interests in three producing diamond-mining operations, being underground mines in South Africa (*Cullinan*, *Finsch* and *Koffiefontein*), and one open mine pit in Tanzania (*Williamson*), which has been on care and maintenance since April 2020.  Petra acquired its majority interests in these four mines between 2007 and 2011 from the De Beers Group ("De Beers"), the world's leading diamond company, as part of De Beers' program to divest its older, non-core assets.

8.    Petra's mines produce the full spectrum of diamonds, with large quantities of the mass market goods,and smaller quantities of much higher value large and special stones. Under normal conditions prior to the COVID-19 pandemic, Petra conducted daily mining operations at the South African mines five days a week and seven days a week at its Tanzanian mine.  After the initial outbreak of COVID-19 in South Africa, however, the South African government instituted COVID-19 response measures that detrimentally impacted the daily production capabilities of Petra's three South African mines.  In an effort to offset their reduced daily production capabilities, the three South African mines have generally conducted mining operations seven days a week during the COVID-19 pandemic.  Operations at Petra's Tanzanian

mine were also significantly impacted by the pandemic, causing Petra to place its Tanzanian mine on care and maintenance in April 2020.

9.      In the ordinary course, Petra sells all rough diamond production by the method of open tender to registered and approved clients (*i.e.*, through an auction).  Petra's South African production is mainly offered for sale at the Johannesburg Diamond Exchange and Export Centre.  Should the highest bid at a tender be below the reserve price, Petra has the option to withdraw the parcel and retain it for sale at a future date.  In certain circumstances, Petra can export unsold diamonds to its marketing office in Antwerp for sale.  Petra's Tanzanian production is sold in Antwerp, one of the world's key diamond centers.  There, the diamonds are sorted and sold via open tender in a similar fashion to the Johannesburg tender process.

10.     As Petra's output has grown, its tenders have attracted an increasing number of significant buyers; many of the world's foremost manufacturers and dealers are now regular Petra clients and interest continues to increase as production levels continue to grow.  In fiscal year 2020 (ending June 30, 2020), revenue for the Group was USD 295.8 million, with EBITDA, on a consolidated (adjusted) basis, of USD 64.8 million.

11.     As of December 1, 2020, Petra employed approximately 3,690 employees and approximately 1,300 contractors worldwide.  The Debtor's U.S. assets include (i) a USD 50,000 undrawn professional fee retainer (the "Retainer") held by Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), as counsel to the Foreign Representative and the Debtor, in a non-interest bearing account located with Citibank, N.A. in New York (the "Retainer Account") and (ii) intangible contract rights under the Notes Indenture (as defined below), which is governed by New York law.

**B.**      **The Debtor's Pre-Restructuring Corporate and Capital Structure**

12.      The Debtor was incorporated under the laws of England and Wales on March 31, 2015.  The Debtor's headquarters and registered office are located at Suite 31, Second Floor, 107 Cheapside, London, EC2V 6DN.  The Debtor's headquarters is its principal place of business, from which it is primarily controlled, and decision-making is primarily made from.  A significant proportion of the Debtors' administrative functions, including accounting, financial reporting, budgeting, and cash management, are conducted in the United Kingdom.

13.      As reflected in the organization chart attached hereto as Exhibit C, the Parent is a holding company that directly owns 100% of the Debtor's equity interests.  The Parent is listed on the London Stock Exchange under the symbol "PDL."  As of December 9, 2020, the Parent's outstanding share capital consists of 865,431,343 ordinary shares, with each carrying one vote.  The Parent is a tax resident in the United Kingdom, and a majority of the members of the Parent's board of directors reside in the United Kingdom.

14.      Pursuant to an indenture, dated as of April 12, 2017 (as amended, supplemented or otherwise modified from time to time, the "Notes Indenture"), between, among others, the Debtor, as issuer, and Deutsche Trust Company Americas, as trustee (the "Notes Trustee"), the Debtor issued USD 650 million in aggregate principal amount of 7.25% senior secured second lien notes due May 1, 2022 (the "Notes" and the beneficial holders of the Notes, the "Noteholders").  The Notes bear interest at a rate of 7.25%, payable in arrears on May 1 and November 1 of each year prior to their maturity.  The Notes Indenture and the guarantees of the Notes (described below) are governed by New York law and all parties thereto, together with the Noteholders, have submitted to the jurisdiction of the courts of the state of New York.  A copy of the Notes Indenture is attached hereto as Exhibit D.

15.     The Notes are guaranteed by the Parent and certain of its direct and indirect subsidiaries, being Willcroft Company Limited ("Willcroft"), Petra Diamonds UK Treasury Limited, Petra Diamonds Jersey Treasury Limited, Petra Diamonds Netherlands Treasury B.V., Ealing Management Services Proprietary Limited ("EMS"), Petra Diamonds Holdings SA Proprietary Ltd, Petra Diamonds Southern Africa Proprietary Limited, Tarorite Proprietary Limited ("Tarorite"), Finsch Diamond Mine Proprietary Limited ("FDM"), Blue Diamond Mines Proprietary Limited ("BDM"), Cullinan Diamond Mine Proprietary Limited ("CDM"), Premier (Transvaal) Diamond Mining Company Proprietary Limited, and Petra Diamonds Belgium B.V. (collectively, the "Guarantors").  The Notes are listed on the Irish Stock Exchange and traded on the Global Exchange Market.

16.     The Notes are secured on a second priority basis to Petra's first lien debt liabilities (being the Existing WCF, the Existing RCF, the BEE Facilities, the Hedging Liabilities (each as defined below) and other general banking facilities) described below.

(a)     Existing WCF:  EMS is the borrower under the existing fully drawn 500 million South African Rand ("ZAR") (in aggregate) working capital facilities (the "Existing WCF") provided by ABSA Bank Limited (acting through its Absa Corporate and Investment Banking division) ("ABSA") and Firstrand Bank Limited (acting through its Rand Merchant Bank Division) ("Firstrand" and together with ABSA, the "Existing WCF Lenders").  The Existing WCF bears interest at a rate equal to the Existing WCF Lender's prime rate.  The Existing WCF is a committed facility until its maturity on July 31, 2021 or, if earlier, the date on which the Existing RCF (as defined below) has been fully and finally repaid and the commitments of the Existing RCF Lenders (as defined below) have been reduced to zero.  The Existing WCF and other general banking facilities are governed by the laws of South Africa.  As of November 30, 2020, there is currently ZAR 500 million (approximately USD 33.4 million)[4] in principal amount, plus approximately ZAR 2.7 million (approximately USD 180,475.25) in unpaid interest, outstanding under the Existing WCF.

---

[4]     All USD approximations of ZAR amounts set forth in this Declaration were calculated as of December 9, 2020 using the applicable USD-ZAR exchange rate published by the *Wall Street Journal* as of market close.

The Existing WCF and the other general banking facilities provided by the Existing WCF Lenders are guaranteed by the Parent, the Debtor and the Guarantors and secured on a first lien basis, *pari passu* with the Existing RCF Lenders, Existing BEE Facility Lenders (as defined below) and the Hedge Providers (as defined below) by the Transaction Security (as defined in the Explanatory Statement) and Willcroft's shares in Williamson Diamonds Limited[5] (together with the Transaction Security, the "First Lien Transaction Security").

(b)   Existing RCF:   EMS is the borrower under the existing revolving credit facility (the "Existing RCF") provided by ABSA and Nedbank Limited (acting through its Nedbank Corporate and Investment Banking division) ("Nedbank" and, together with ABSA, the "Existing RCF Lenders"). EMS has drawn down on ZAR 400 million (approximately USD 26.7 million) of the Existing RCF, which may be increased up to ZAR 1 billion (approximately USD 66.8 million). As of November 30, 2020, there is an additional approximately ZAR 1.4 million (approximately USD 93,579.76) outstanding in unpaid interest under the Existing RCF. The Existing RCF bears interest at a rate equal to the Johannesburg Interbank Average Rate ("JIBAR") plus 9% per annum and matures on July 31, 2021. EMS may use the Existing RCF for the purposes of funding various prospecting and mining projects of the Group, funding the Group's capital expenditures and for working capital requirements. The Existing RCF is governed by the laws of South Africa.

The Existing RCF is guaranteed by the Parent, the Debtor and the Guarantors and secured on a first lien basis, *pari passu* with the Existing WCF Lenders, the Existing BEE Facility Lenders and the Hedge Providers, by the First Lien Transaction Security.

(c)   BEE Facilities:   Itumeleng Petra Diamonds Employee Trust[6] and Kago Diamonds (Pty) Limited[7] (together, the "BEE Partners") obtained term loan financing (the "BEE Facilities" and, together with the Existing WCF and the Existing RCF, the "First Lien Facilities") from ABSA, Firstrand and Ninety One SA Proprietary Limited (for and on behalf of its clients) (collectively, the "Existing BEE Facility Lenders" and, together with the

---

[5]   Willcroft is a direct, wholly owned subsidiary of the Parent. Williamson Diamonds Limited ("WDL") is an indirect subsidiary of the Parent and direct subsidiary of Willcroft, of which Willcroft owns 75% and the government of Tanzania owns 25%.

[6]   Itumeleng Petra Diamonds Employee Trust is a 12% shareholder in each of FDM, BDM and CDM (collectively, the "South African Mine-Owning Entities"). The South African Mine-Owning Entities are indirect and partially owned subsidiaries of the Parent that hold the assets relevant to each of the three mining operations in South Africa.

[7]   Kago Diamonds (Pty) Limited is a 14% shareholder in each of the South African Mine-Owning Entities and a 26% shareholder in Tarorite. Tarorite is a South African service company and indirect partially owned subsidiary of the Parent.

Existing WCF Lenders and the Existing RCF Lenders, the "First Lien Lenders") to refinance amounts owing by the BEE Partners to the Group, which had provided funding to the BEE Partners to enable them to acquire their interests in the South African Mine-Owning Entities.  The aggregate principal amount outstanding under the BEE Facilities as of November 30, 2020 is ZAR 683 million (approximately USD 45.6 million), plus approximately ZAR 2.4 million (approximately USD 160,422.45) in unpaid interest.  Each BEE Facility is secured on a first lien basis by the relevant BEE Partner's shares in and claims against the South African Mine-Owning Entities (as defined below), claims against third parties, bank accounts and key contracts.

Each BEE Facility is guaranteed by the Parent and the Security SPV (as defined in the Scheme) and, as a result, is secured by the First Lien Transaction Security on a *pari passu* basis with the Existing WCF Lenders, the Existing RCF Lenders and the Hedge Providers.  The maturity date of the BEE Facilities is July 31, 2021.  The BEE Facilities bear interest at a rate equal to JIBAR plus 9% per annum that is payable on a semi-annual basis.  The BEE Facilities are governed by the laws of South Africa.

(d)     Hedging Arrangements:  Because the Group's First Lien Facilities are in ZAR, but its revenues are in U.S. dollars, the Group monitors the movement of the ZAR against the U.S. dollar and hedges a portion of future diamond sales when weakness in the Rand indicates it is appropriate to do so.  The hedging facilities are generally short term in nature, provided pursuant to the Hedging Agreements (as defined in the Explanatory Statement) between any of the Parent, Debtor or a Guarantor and ABSA, Firstrand or Nedbank (collectively, the "Hedge Providers").  The mark to market exposure of the Group under or in connection with the Hedging Agreements to a hedging transaction was approximately ZAR 15.6 million (approximately USD 1.04 million) as of November 30, 2020 (the "Hedging Liabilities").  The Hedging Liabilities are secured and rank *pari passu* with the First Lien Facilities.

## C.     **Events Preceding Commencement of the English Proceeding**

17.     Since acquiring the mining rights in its four mines from De Beers between 2007 and 2011, Petra has made significant capital expenditures in the mines.  Prior to Petra's ownership, the mines had all undergone a prolonged period of period of underinvestment, with insufficient capital and other resources committed to their long-term continuity.  As a result, Petra invested USD 1.6 billion during fiscal years 2006 to 2020 with the goal of remedying the effects of the prolonged underinvestment in order to extend the lives of the assets to the benefit of all

stakeholders. This significant investment period resulted in Petra's annual production growing from approximately 170,000 carats in fiscal year 2006 to approximately 3.9 million carats in fiscal year 2020 and its annual revenue growing from USD 20.9 million to USD 463.6 million over the same period. The capital investment, however, required significant debt financing. In 2017, the Debtor issued the Notes to bolster its balance sheet and provide Petra with greater financial flexibility.

18.    Petra's performance is closely linked to market trends in the diamond market. The last six years, however, have seen a significant decline in rough diamond prices. The Bloomberg rough diamond price index, which has suspended publication of figures since March 2020 due to the COVID-19 pandemic, has rough diamond prices declining annually by 19% as of March 31, 2020, and diamond prices realized by the Group decreased by 18% in fiscal year 2020. This, in turn, has had a significant effect on the Debtor's financial health and prospects.

19.    In response to the decline in rough diamond prices, in July 2019, Petra launched a bottom-up assessment of its business to identify opportunities, drive efficiencies and facilitate improvements across all aspects of the business (such initiative, "Project 22"). The objective of Project 22 was to deliver an initial target of USD 150-200 million free cash flow over a three-year period, with delivery weighted toward fiscal years 2021 and 2022, and reduce net debt in the Group. Project 22 has had a positive impact on productivity, with the Group delivering the highest level of run-of-mine production (*i.e.*, ore that is mined and ready to be transported to the processing plant) recorded in the Parent's history for the first nine months of fiscal year 2020 prior to the impact of mine closures and reduced production capability as a result of COVID-19 response measures. However, the global decline in rough diamond prices and the impact of COVID-19 on

the fiscal year 2020 tenders had a significant impact on the Group's revenue, largely offsetting the immediate benefits achieved through Project 22.

20.     In June 2020, the Parent launched a public sale process, by tender, with the intention of finding a buyer for the Group's businesses.  Given the specialized nature of the industry in which the Group operates, the sale process was marketed to a group of approximately 70 potential buyers, based on advice from the Group's advisors.  On or around July 27, 2020, the Group received non-binding bids from prospective buyers.  After careful consideration, Petra and its board of directors determined that a disposal of the business, or a sale of substantially all of the Group's assets for the consideration offered, was not in the best interests of the Group's stakeholders, particularly in light of the expected benefits to the Group's stakeholders if the Group proceeded with the Restructuring (which, as described below, was being negotiated around the same time).  As a result, the Group determined not to pursue any of the bids, at least until after the Restructuring is implemented (or becomes incapable of implementation).

21.     Like other companies throughout the world, the economic uncertainty caused by the COVID-19 pandemic and the restrictions imposed by governments in response to the COVID-19 pandemic have further impacted the Group's revenue.  The total revenue impact as a result of the COVID-19 pandemic is expected to be USD 97.11 million for fiscal year 2020.

**D.      Restructuring Negotiations and the Lock-Up Agreement**

22.     As a result of its operating results and cash flow position, Petra failed to meet cash flow-related financial covenants under the First Lien Facilities in respect of December 2019 covenant tests.  The Parent has, since March 2020, sought and obtained waivers from the First Lien Lenders of such covenant defaults.  In May 2020, Petra failed to pay the interest payment on the Notes, triggering a default under the Notes Indenture.  In response, on May 29, 2020, Petra

entered into a forbearance agreement (the "Forbearance Agreement") with an ad hoc committee (the "Ad Hoc Committee") of Noteholders holding approximately 50.7% of the total Notes Debt[8] and an amendment to the First Lien Facilities (the "First Lien Amendment Agreement") with the First Lien Lenders, pursuant to which the Parent drew down on each of the Existing RCF and the Existing WCF in the amounts of ZAR 400 million (approximately USD 26.7 million) and ZAR 500 million (approximately USD 33.4 million), respectively, to meet short-term liquidity needs. The First Lien Amendment Agreement also aligned the maturity dates of each of the First Lien Facilities and rescheduled capital repayments due in May 2022 and November 2022, among other things. Each of the Forbearance Agreement with the members of the Ad Hoc Committee and the First Lien Amendment Agreement with the First Lien Lenders was intended to be an interim measure to address Petra's immediate liquidity concerns, and the counterparties agreed that a broader financial restructuring with the Group would follow.

23.     In an effort to achieve a restructuring of its balance sheet, the Group, the Ad Hoc Committee and the First Lien Lenders continued extensive negotiations to address Petra's ongoing debt service obligations in respect of the Notes and, as a result, have proposed the Restructuring, of which the Scheme is an integral part. The Restructuring, if implemented, will result in a material reduction of the aggregate principal amount of indebtedness, extended maturities, and the issuance of equity to the Scheme Creditors who are Noteholders. The Restructuring will also provide additional liquidity to the Group, while reducing the overall principal amount of debt and cash-pay interest obligations of the Group. Consummation of the

---

[8]     As defined the Explanatory Statement, "Notes Debt" includes, in relation to the Notes, all present and future monies debts and Liabilities (as defined in the Explanatory Statement) owed or incurred from time to including the outstanding principal amount of such Notes and any accrued but unpaid interest, by the Parent, the Debtor or any Guarantor.

Restructuring will put the Group in a stronger position to continue operations to realize and optimize the value of its mining assets, particularly in the current market conditions, and to deliver growth for the Debtor's stakeholders.

24.     On November 17, 2020, following negotiations with the Ad Hoc Committee and the First Lien Lenders, the Debtor entered into a lock-up agreement (the "Lock-Up Agreement") with (i) all of the First Lien Lenders and (ii) Noteholders representing approximately 61.2% of the aggregate principal amount of the Notes.  As of the Early-Bird Deadline (as defined below), Noteholders subject to the Lock-Up Agreement hold approximately 94.92% of the aggregate principal amount of the Notes.  Pursuant to the Lock-up Agreement, the parties agreed, among other things and subject to certain conditions, to take all steps and other actions reasonably necessary to support, facilitate, implement, consummate or otherwise give effect to the Restructuring, including, in respect of the participating Noteholders, by virtually attending the Scheme Meeting in person or by proxy and voting in favor of the Scheme, and by not taking certain enforcement actions with respect to the Debtor, including in respect of the missed interest payments due November 2020, subject to customary limited carve-outs.  The Lock-Up Agreement further provides that each Noteholder that executed the Lock-Up Agreement on, or within 14 days of, the date of that agreement (the "Early-Bird Deadline") is entitled to a lock-up fee (the "Lock-Up Fee") in consideration for the benefit afforded to Petra from the certainty as to support for the Restructuring and votes in favor of the Scheme at the Scheme Meeting.  The Lock-Up Fee for each applicable Noteholder is equal to 1% of the principal amount of Notes held by the Noteholder that were subject to the Lock-Up Agreement as of the Early-Bird Deadline.  The Lock-Up Fee is payable in New Notes (as defined below).

E.        **Description of the Scheme and the Restructuring**

25.        The primary objectives of the Restructuring, and therefore the Scheme, are to:  (i) achieve extensive deleveraging of the Group to ensure a stable Group capital structure, which will result in a stronger balance sheet position, a more appropriate level of annual debt service obligations, extended debt maturity dates and a covenant package consistent with the Group's financial forecasts; (ii) improve the ongoing liquidity position of the Group; (iii) enable the Group to direct its cash resources towards servicing the Group's general corporate and working capital requirements and necessary capital expenditures; (iv) obtain new capital to enable the Group to finance its debt capital and ongoing expenses and to help facilitate operational performance at the mines; (v) allow the Group to continue to service its customers, supply the global market, and pay its suppliers and support its employees; (vi) mitigate the risk and avoid the adverse consequences of any form of insolvency filing by any Group entity; and (vii) provide the Scheme Creditors that are Noteholders with the opportunity to benefit from future potential upside through their receipt of new ordinary shares in the Parent.

26.        The Restructuring and the Scheme are described in detail in the explanatory statement that accompanied the Debtor's application to the English Court for a hearing to convene the Scheme Meeting (the "Explanatory Statement"), a copy of which is attached hereto as Exhibit E, and include the following key terms:[9]

---

[9]    The following summary of the Restructuring is provided solely for ease of reference.  Although I believe the summary is fair and accurate, it is qualified in its entirety by the Explanatory Statement (including the Scheme attached thereto), which is incorporated herein by reference.  In the event of any conflict, inconsistency, or discrepancy between a description of the Restructuring in this Declaration and the Explanatory Statement, the Explanatory Statement governs and controls for all purposes.

(a)    <u>New Money Investment & Backstop</u>:  A key feature of the Restructuring is the USD 30 million to be contributed to the Debtor (the "<u>New Money</u>") by certain Noteholders as a subscription for, or purchase of, USD 30 million of New Notes (as defined below) (such New Notes, the "<u>New Money Notes</u>" and such Noteholders, the "<u>New Money Noteholders</u>").  Each Noteholder will have the right to subscribe pro for a portion of the New Money pro rata to the proportion of the total aggregate principal amount of the Notes that the Noteholder holds as of 5.00 p.m. (New York time) on January 6, 2021 (the "<u>Record Time</u>"), and the option to oversubscribe for the New Money by electing to subscribe for its pro rata portion of the amount that is the difference between USD 30 million and the aggregate amount of the New Money committed by all Noteholders (the "<u>New Money Shortfall</u>").  Pursuant to a backstop agreement (the "<u>Backstop Agreement</u>"), certain Noteholders have agreed to backstop the New Money.  In exchange, each such Noteholder will receive its *pro rata* share (based on its backstop commitments) of USD 1.5 million in principal amount of the New Notes (being 5% of the New Notes issued as New Money Notes) (the "<u>Backstop Fee</u>").

(b)    <u>New Notes</u>:  The Scheme will effect the assignment and cancellation of the Notes Debt of each Scheme Creditor in exchange for a debt-for-equity conversion and the partial reinstatement of the Notes by virtue of the issue to each Noteholder of new senior secured second lien notes (the "<u>New Notes</u>").  The key features of the New Notes, as they differ from the Notes (and as will be documented in the amended Notes Indenture (the "<u>Amended Notes Indenture</u>")), are as follows:

    (i)    *Amount*:  The amount of the New Notes is expected to be approximately USD 337 million on completion of the Restructuring.

    (ii)    *Maturity Date*:  The New Notes will have a maturity date of five years from the effective date of the Restructuring, reflecting an extension of the existing maturity date (May 2022).

    (iii)    *Interest*:  The New Notes will bear interest (A) payable in-kind at a rate of 10.50% per annum for the first 24 months of the term of the New Notes and (B) thereafter, payable in cash at a rate of 9.75% per annum, in each case payable semi-annually in arrears.  Pursuant to new intercreditor arrangements between the Noteholders and the First Lien Lenders, the cash-pay interest applicable after the first 24 months is subject to the following conditions:  (X) a debt service ratio covenant (being the ratio of cash flow to the debt service on the New Bank Facilities (as defined below)) equal to at least 1.3x; (Y) the amount outstanding under the New RCF (as defined below) must not be more than ZAR 400 million (as reduced over time through amortization in accordance with the terms of the New RCF) immediately prior to the interest payment and for a period of two (2)

weeks thereafter; and (Z) the Parent must be able to evidence that its unrestricted cash balance post payment of the interest payment would be in excess of USD 20 million (clauses (X) through (Z) hereunder, the "Coupon Payment Conditions"). If the Coupon Payment Conditions are not met and the Debtor cannot pay the cash-pay interest payment, it will be in default under the Amended Notes Indenture.

(iv)    *Non-Call Protection*: The Amended Notes Indenture will contain two-year non-call protection (with a customary make-whole obligation) and a coupon step-down profile thereafter at 104.88%, 102.44%, then par (but excluding any prepayments or redemptions).

(v)    *Covenants*: The Amended Notes Indenture will contain restrictive covenants and a tightening of existing covenants relative to the current Notes Indenture, including capped baskets of first lien debt and prohibitions on other *pari passu* or junior unsecured debt being incurred (the latter being subject to ordinary course exceptions). The Amended Notes Indenture will also contain a minimum liquidity covenant for the Parent, the Debtor and the Guarantors.

(vi)    *Guarantors*: The Parent, Petra Diamonds UK Services Limited and the existing Guarantors (other than Petra Diamonds Jersey Treasury Limited and Petra Diamonds Netherlands Treasury B.V., which will be released as Guarantors) will guarantee the New Notes.

(vii)    *Security Package*: The New Notes will retain substantially the same second ranking security package, including guarantees from a majority of the Group members. The security package will also be enhanced to include (without limitation) security in favor of the Noteholders over intra-Group offtake receivables and inventory at all relevant points in the Group's supply chain (unless and until such inventory is sold to a third party). The Group will also be bound by a pre-enforcement cash flow waterfall, which will cover all cash flows in, out and within the Group (excluding WDL).[10]

(viii)    *Events of Default*: The events of default under the Amended Notes Indenture will be the same as those under the Notes Indenture, as amended to take into account the new covenants related to the New Notes.

(ix)    *Rating and Listing*: The Parent will procure a public instrument rating on the New Notes within six months of the effective date of the Restructuring and will be required to maintain a rating on the

---

[10]    WDL will remain a ring-fenced asset outside the security package for the New Notes.

New Notes.  The New Notes will be listed on the Official List of the Irish Stock Exchange.

Each Noteholder's proportion of its Notes Debt that will be reinstated as New Notes will be determined by the following factors:

(A)     whether, and to the extent to which, the Noteholder has elected to exercise its entitlement to contribute to the New Money;

(B)     whether, and to the extent to which, the Noteholder has subscribed for the New Money and therefore has elected to provide (on a *pro rata* basis) any portion of the New Money not otherwise contributed by the initial *pro rata* entitlement contributions of electing Noteholders;

(C)     whether the Noteholder has been required to subscribe for a further portion of New Notes in respect of the New Money, which shall be in addition to their *pro rata* entitlement and any oversubscription, pursuant to the Backstop Agreement (in which the Noteholders have agreed to backstop the New Money to the extent that there is a New Money Shortfall which remains after taking account of all oversubscriptions by Noteholders or if any of the New Money committed by the New Money Noteholders is not funded by the due date for funding the New Money);

(D)     whether the Noteholder is entitled to a New Money Noteholder portion of the US 150 million of the New Notes, such portion to be *pro rata* to the New Money Noteholder's aggregate contribution to the New Money (including its own *pro rata* entitlement, any oversubscription and any amount of the New Money Shortfall that the New Money Noteholder is required to provide under the Backstop Agreement) as a proportion of the total New Money.  This entitlement represents a roll-up of the New Money Noteholders at a ratio of 5.0:1 (five New Notes dollars for every one New Money dollar (as an addition to the New Notes issued in consideration for the New Money));

(E)     each Noteholder's (including the New Money Noteholders') entitlement to USD 145 million allocation of the New Notes, such allocation to be *pro rata* to the proportion of the aggregate principal of all Notes that each Noteholder holds at the Record Time; and

(F)     the Noteholders are each eligible for certain fees in connection with the Restructuring, including the Lock-Up Fee and the Backstop Fee.

(c)     <u>Debt-for-Equity Exchange</u>: For the Scheme Creditors that are Noteholders, the Restructuring will involve the assignment of the portion of each Noteholder's Notes that is not to be reinstated as New Notes to the Parent in exchange for the issue of new ordinary shares of the Parent to the Noteholders. The new ordinary shares will be issued to each Noteholder as follows: (i) a total of 56% of the Parent's post-Restructuring equity to be issued to all Noteholders (including the New Money Noteholders), to be allocated pro rata to the proportion of the aggregate principal of all Notes that the Noteholder holds at the Record Time and (ii) a total of 35% of the Parent's post-Restructuring equity, to be issued to New Money Noteholders pro rata to the New Money Noteholder's aggregate contribution to the New Money (including its own entitlement, any oversubscription and any amount of the New Money Shortfall that the New Money Noteholder was required to provide in accordance with the Backstop Agreement) as a proportion of the total New Money. The Parent's listing on the London Stock Exchange will be retained. The Parent's issuance of the new ordinary shares is subject to approval by its existing shareholders, and such approval is a condition to the effectiveness of the Scheme.[11]

(d)     <u>First Lien Facilities</u>: In connection with, and conditional on, the Restructuring, the First Lien Lenders, the Parent and the Group have agreed to the following terms related to the First Lien Facilities (the "<u>New Bank Facilities</u>"):[12]

(i)     *New Term Loan*: The Existing WCF Lenders and the Existing BEE Facility Lenders have agreed to provide the Group with a term loan (the "<u>New Term Loan</u>") in the amount of ZAR 1.2 billion (approximately USD 80.2 million), to be fully drawn on the

---

[11]   If the existing shareholders do not vote to approve the issuance of new ordinary shares, the Restructuring will not be implemented. In such circumstances, it may be possible to consummate an alternative restructuring involving the transfer of certain of the Group's assets and liabilities, including all of the Debtor's subsidiaries, cash balances and other assets, to a specially incorporated vehicle owned by the Noteholders by way of a credit bid (the "<u>Noteholder Credit Bid</u>"). The Noteholder Credit Bid would be expected to involve the Group filing for administration in England pursuant to the Insolvency Act 1986 (UK) and provisional liquidation in Bermuda pursuant to section 161 of the Bermudan Companies Act 1981, in parallel. The Scheme provides for the relevant provisions of the Notes Indenture to be amended to permit the Group to raise up to USD 45 million in interim 1.5 lien financing to pursue the Noteholder Credit Bid. The Noteholder Credit Bid, if utilized, would likely be implemented through a second scheme of arrangement or a restructuring plan (pursuant to Part 26 or Part 26A of the Companies Act 2006) once terms had been agreed between the relevant parties. The Lock-Up Agreement does not require the parties to the Lock-Up Agreement to support the Noteholder Credit Bid.

[12]   Given that the First Lien Lenders have already agreed to the New Bank Facilities, their further approval of the Scheme is not required and thus they are not Scheme Creditors (which include only the Notes Trustee, the Noteholders, DTC, as the registered holder of the Global Notes, and Cede & Co., as the nominee for DTC).

effective date of the Restructuring, to settle the drawn Existing WCF and the BEE Facilities. The New Term Loan will have a maturity three years from the effective date of the Restructuring and bear interest at a rate of JIBAR plus 5.25% per annum, with an upfront fee of 1% of the amount of the New Term Loan (the latter being capitalized).

(ii)    *New RCF*:  The Existing RCF Lenders have agreed to provide the Group a new revolving credit facility (the "New RCF") in the amount of ZAR 560 million (approximately USD 37.4 million), of which ZAR 400 million (approximately USD 26.7 million) shall be drawn on the effective date of the Restructuring, rolled over from the Existing RCF. The New RCF will be used for working capital purposes and to settle the drawn Existing RCF. The New RCF will have a maturity three years from the effective date of the Restructuring and bear interest at a rate of JIBAR plus 5.25% per annum, with an upfront fee of 1% of the amount of the New RCF (the latter being capitalized). There will be a commitment fee on any undrawn commitments under the New RCF of 2.1% per annum.

(iii)   *Ancillary Facilities*:  The First Lien Lenders have agreed to continue to make available certain ancillary facilities including guarantee lines and soft lines to the Group, which, as of the date of the Explanatory Statement, consist of a ZAR 32 million (approximately USD 2.1 million) guarantee line and a ZAR 1.045 billion (approximately USD 69.8 million) soft line, each consistent with the pre-May 2020 amendment levels and the operational requirements of the Group going forward.

(iv)    *Hedging*:  The First Lien Lenders have agreed to allow for hedging lines of up to ZAR 300 million (approximately USD 20.0 million) of aggregate potential future exposures to hedge against the Group's foreign currency exchange risks. The terms of the Group's existing hedging arrangements will be amended to have maturities staggered over the year following the effective date of the Restructuring.

27.    The Scheme also provides that the Scheme Creditors authorize the waiver and release of the Released Parties[13] from certain claims relating to the Notes, the Scheme and the

---

[13]    As defined in the Deed of Release, "Released Parties" includes the Scheme Creditors (as defined in the Scheme), the Debtor, Parent, Guarantors, and other Company Parties (as defined in the Scheme), the advisers who have advised on the Restructuring and certain administrative parties, including the Notes Trustee, the Security SPV (as defined in the Scheme), Cede & Co, DTC, and the Information Agent, and in each case their respective affiliates, related entities, and each such person's and its affiliates' and related entities' current and former officers, managers, directors, predecessors, successors, and assigns, each of their directors, officers, employees, agents, managed accounts or funds, management companies, investment managers or advisors (and any entity which:

Restructuring, as applicable.    Specifically, the Scheme provides that the Scheme Creditors authorize the Debtor to enter into the deed of release appended to the Scheme as Schedule 2 (the "Deed of Release") on behalf of the Scheme Creditors.  The Deed of Release will become effective and unconditionally and irrevocably binding upon all Scheme Creditors (and any person who acquires any interest in a Scheme Claim (as defined in the Scheme) after 5:00 p.m. (New York time) on January 6, 2021) on the Restructuring Effective Date (as defined in the Scheme).  *See* Ex. E, app. 1 at § 6.  The Deed of Release provides that, subject to certain exceptions, the Scheme Creditors release the Released Parties from any claims they may have had, currently have or in the future may have, in connection with or in any way arising out of the Scheme Claims, the Notes Indenture, the Notes (including the Guarantors' guarantee of the Notes), the Scheme and the Restructuring.  *See* Ex. E, Sch. 2 at § 2.2.  Additionally, under the Deed of Release, the Scheme Creditors covenant not to take certain actions against the Released Parties with respect to claims arising under the Notes, and the preparation, negotiation or implementation of the Scheme or the Restructuring.  *See id.* at § 4.1.  The waivers, releases and discharges are integral to the Restructuring and necessary to ensure that Scheme Creditors cannot undermine the aims of the Restructuring by bringing claims against other entities involved in the preparation, negotiation, sanction or implementation of the Restructuring, which might in turn give rise to indemnification, contribution or subrogation claims against the Debtor.

## F.    <u>Consequences of a Failure to Implement the Restructuring</u>

28.    If the Scheme is not approved by the requisite majorities of Scheme Creditors, recognition of the Scheme pursuant to chapter 15 of the Bankruptcy Code is not granted,

---

(1) is managed or advised by such person's investment manager or advisor; or (2) such person manages or advises in its capacity as investment manager or advisor), advisory board members, financial advisers, partners, accountants, attorneys, investment bankers, consultants, representatives and other professionals.  *See* Ex. E, App. 1, Sch. 2 at 2.

or any of the other requirements or conditions to the Restructuring are not satisfied (or, where possible, waived) to enable the Restructuring to be implemented in accordance with the presently proposed timetable, the Restructuring is not likely to be consummated. The Debtor believes that, in light of the considerable effort and time which it has taken for the Debtor and the Group to agree to the Restructuring with the First Lien Lenders and the members of the Ad Hoc Committee, the prospects of the Debtor and such key stakeholders agreeing to an alternative transaction that would leave the Group with a viable capital structure before it would become necessary to place the Debtor (and possibly other companies in the Group) into an insolvency procedure are unlikely.

29.    As discussed above, the First Lien Lenders and certain of the Noteholders have agreed to forbear on a number of existing potential events of default pursuant to the First Lien Amendment Agreement, the Forbearance Agreement and the Lock-Up Agreement. The Debtor believes that there is a significant risk that the First Lien Lenders and/or the Noteholders would terminate the present forbearance arrangements if it becomes apparent that the Restructuring is not capable of being implemented (because, for example, the requisite majorities of Scheme Creditors do not vote in favor of the Scheme, the English Court determines not to exercise its discretion to sanction the Scheme, or recognition of the Scheme pursuant to chapter 15 is not granted). In those circumstances, the Debtor considers it likely that one or more of the First Lien Lenders, the Noteholders or other creditors of the Group would exercise enforcement-related rights or remedies available to such creditors. The Debtor may then conclude that the best course of action for the Group would be for the Parent, the Debtors and the Guarantors that hold the Group's significant assets to petition the courts (in the relevant jurisdictions) to commence insolvency procedures to, where possible, benefit from statutory moratoriums and to preserve the Group's going concern position.

30.     In such insolvency proceedings, it is likely that an accelerated marketing and sales process of the business of the Group would be undertaken with a view to effecting a going concern sale (or sales) of the Group's key and operating assets within a short period of time. With respect to the South African Mine-Owning Entities, successful completion of any such sale would be subject to the relevant regulatory approvals being sought and obtained.  The Debtor expects such regulatory approval processes to take up to nine months to resolve from such date as the officeholders appointed to oversee the insolvency proceedings are able to reach binding terms with a prospective buyer. The officeholders would remain in control of the relevant entity(ies) (with the associated costs continuing to accrue) for the entirety of this period.

31.     The Group would likely need additional funding during any insolvency proceedings as to continue trading during such time.  If funding were not to be available, either from the First Lien Lenders, a prospective buyer or otherwise, the Group's creditors would likely bring enforcement actions against the Group members that are obligors and/or Guarantors (including the Parent, the Debtor and the South African Mine-Owning Entities).  Liquidation or similar proceedings for the Parent, the South African Mine-Owning Entities, the Group and/or potentially other Group members would commence as a result of applicable filings under the relevant local laws. Fragmented proceedings in various jurisdictions may be required, for example, as a result of the Group's creditors enforcing their security in multiple jurisdictions, and such proceedings may pose challenges to selling the Group as a going concern.  Furthermore, the South African Mine-Owning Entities would likely lose their mining rights as a result of commencing liquidation proceedings.  A liquidation scenario is likely to be highly value-destructive for the Group and result in significant job losses for the Group's employees and contractors.

G.    **The English Proceeding**

32.    To implement the Scheme and, therefore, the Restructuring, the Debtor commenced the English Proceeding on December 2, 2020, by applying to the English Court for a hearing to convene the Scheme Meeting (the "Convening Hearing").   The application to the English Court was accompanied by (i) the Explanatory Statement and all documents appended thereto (including the Scheme, which is attached as Appendix 1 to the Explanatory Statement) and (ii) witness statements of myself and David John Shilson.   Prior to the commencement of the English Proceeding, notice of the same was given to the Scheme Creditors by means of a "practice statement" letter, dated November 17, 2020, which is attached hereto as Exhibit F.

33.    On December 9, 2020, the English Court held the Convening Hearing and subsequently issued the Convening Order.  The Convening Order (i) confirms that the Scheme Meeting will be held at 11:00 a.m. (London time) on January 8, 2021, virtually using Zoom (or at such other time or date as the Debtor may decide and notify to the Scheme Creditors), (ii) declares that the Foreign Representative is authorized to act as foreign representative in respect of the English Proceeding, including in any chapter 15 proceeding in the United States and (iii) confirms the documents and notices that will be sent to the Scheme Creditors, including notice of the Scheme Meeting (the "Scheme Meeting Notice") to be delivered to Scheme Creditors as soon as reasonably practicable after the Explanatory Statement has been posted to the Information Agent's website.  *See* Ex. B at ¶¶ 2-3, 4-5, 26.  Following entry of the Convening Order, on December 10, 2020, the Debtor delivered the Scheme Meeting Notice and the Explanatory Statement for the Scheme to the Scheme Creditors.[14]

---

[14]    The Convening Order provides that the Scheme Meeting Notice will be (a) sent by email to The Depository Trust Company, Euroclear Bank S.A./N.V. and Clearstream Banking, *société anonyme* for distribution to the Scheme Creditors; (b) published via the Regulated News Service operated by the Irish Stock Exchange and as otherwise required by the rules of the Irish Stock Exchange; (c) published via the Regulated News Service operated by the

34.     It is currently anticipated that the hearing to sanction the Scheme (the "Sanction Hearing") will be held on January 12, 2021.  If the English Court enters an order approving the Scheme (the "Sanction Order"), the Scheme will become effective pursuant to its terms, and thereby binding on all Scheme Creditors of the Debtor wherever located, upon delivery of the Sanction Order to the Registrar of Companies in England and Wales.  Importantly, however, this Court's entry of an order recognizing the Scheme in the United States is a condition precedent to the implementation of the Scheme, and therefore, the implementation of the Restructuring.

**REQUESTS FOR RECOGNITION AND RELATED RELIEF**

35.     In connection with the filing of this chapter 15 case, the Debtor has submitted the Petition and Motion.  In addition to the facts set forth above, I believe, after consultation with counsel, that the relief requested by each of the motions is necessary to maximize value for all of the Scheme Creditors and, given that the Scheme is an integral element of the Restructuring, the Debtor's other creditors and stakeholders, to protect the Debtor and its assets in the United States and to properly administer this case.

36.     As explained in the Petition and Motion, the relief requested therein is necessary to (a) ensure that all of the Scheme Creditors affected by the Scheme are treated consistently, regardless of whether they are located in the United Kingdom or the United States, (b) protect the Debtor from any lawsuits in the United States from those who are bound by, and

---

London Stock Exchange; and (d) available via the 'News Announcements' section of the Parent's website (https://www.petradiamonds.com/investors/news/).  The Scheme Meeting Notice and certain related documents will also be made available to Scheme Creditors via the Information Agent's website through which it will disseminate information about the Scheme, www.lucid-is.com/petradiamonds.  *See* Ex. B at ¶ 4.

benefit from, the terms of the Scheme and (c) minimize the risk of indemnification and other claims that might be alleged under the Notes Indenture.

37.     The Debtor has property in the United States and in this jurisdiction.  Paul, Weiss, as counsel to the Foreign Representative and the Debtor, holds the Retainer in the Retainer Account.  The Debtor's funds remain in the Retainer Account as of the date hereof and are the Debtor's property (subject to Paul, Weiss's rights under its engagement letter).  In addition, the Notes Indenture and the guarantees granted by certain of the Debtor's subsidiaries in respect of the Notes are governed by New York law and contain provisions submitting the parties thereto to the jurisdiction of the New York state and federal courts.  *See* Ex. D, §§ 12.6, 12.7.  I am advised that under relevant law, the Debtor's rights under such instruments constitute interests in property located within the United States.

38.     To the best of my knowledge and belief, the English Proceeding (a) constitutes a "foreign main proceeding" within the meaning of 11 U.S.C. § 1502(4), as the Debtor is headquartered in the United Kingdom, which is its center of main interests and (b) is a judicial proceeding in the United Kingdom under English law relating to insolvency or the adjustment of debt in which the assets and affairs of the Debtor are subject to control and supervision of the English Court for the purpose of recapitalization or liquidation.  Accordingly, I believe the English Proceeding constitutes a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

39.     Finally, as described in the Petition and Motion and as discussed with counsel, I understand and believe that recognizing the English Proceeding as a foreign main proceeding and granting the relief requested therein on a final basis is consistent with the purposes of chapter 15 of the Bankruptcy Code and public policy of the United States.  Therefore, I believe

that the relief requested in the Petition and Motion is necessary and appropriate and in the best

interests of the Debtor, its creditors and other parties in interest.

## SECTION 1515(c) STATEMENT

40.     I am informed that section 1515(c) of the Bankruptcy Code provides that

"[a] petition for recognition shall also be accompanied by a statement identifying all foreign

proceedings with respect to the debtor that are known to the foreign representative."

41.     In compliance with section 1515(c) of the Bankruptcy Code, I hereby

declare that, to my knowledge, the only foreign proceeding (as such term is defined in

section 101(23) of the Bankruptcy Code) pending with respect to the Debtor is the

English Proceeding.

## LIST PURSUANT TO BANKRUPTCY RULE 1007(A)(4)

42.     I am informed that rule 1007(a)(4) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") provides that a foreign representative filing a petition for

recognition under chapter 15 of the Bankruptcy Code shall file with the petition:

> (A) a corporate ownership statement containing the information described
> in [Bankruptcy] Rule 7007.1; and (B) unless the court orders otherwise, a
> list containing the names and addresses of all persons or bodies authorized
> to administer foreign proceedings of the debtor, all parties to litigation
> pending in the United States in which the debtor is a party at the time of the
> filing of the petition, and all entities against whom provisional relief is being
> sought under § 1519 of the [Bankruptcy] Code.

In accordance with Bankruptcy Rule 1007(a)(4), I hereby provide the following information:

(a)     Corporate Ownership Statement:   In accordance with Bankruptcy

Rules 1007(a)(4) and 7007.1, the following is a corporate ownership statement of the Debtor,

which identifies any individual, corporation or other entity that directly or indirectly owns ten (10)

percent or more of any class of the Debtor's equity interests as of December 9, 2020:

26

- <u>Petra Diamonds Limited</u>:  Petra Diamonds Limited directly owns 100% of the Debtor's equity interests, the Debtor's only class of equity interests.  The following identifies holders having an equity ownership of ten (10) percent or more in Petra Diamonds Limited (as of October 5, 2020):

  - Standard Life Aberdeen plc (10.5%); and

  - M&G plc (10.2%).

(b)  <u>Persons or Bodies Authorized to Administer the Foreign Proceeding</u>:  I was appointed by the board of directors of the Debtor as the Debtor's foreign representative on November 30, 2020, and the English Court declared on December 9, 2020, that I am authorized and empowered to act as the foreign representative of the Debtor in respect of any chapter 15 case that may be commenced in the United States.  My contact address is c/o Petra Diamonds US$ Treasury plc, Suite 31, Second Floor, 107 Cheapside, London, EC2V 6DN.

(c)  <u>Pending Litigation</u>:  I am not aware of any litigation pending in the United States in which the Debtor is a party.

(d)  <u>Provisional Relief</u>:  I am not seeking provisional relief at this time because I am not aware of any imminent threat to the Debtor's assets located in the United States or to the English Proceeding by virtue of actions in the United States.

*[Remainder of page intentionally left blank.]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: December 15, 2020

By: /s/ *Jacques Breytenbach*
Name:  Jacques Breytenbach
Title:    Chief Financial Officer of Petra Diamonds Limited